JACK TURNER et al., Petitioners and Cross-Respondents, v. THE HUMAN RIGHTS COMMISSION, Respondent (Albert Fletcher et al., Respondents and Cross-Petitioners).

First District (4th Division) Nos. 86—2942, 87—0203, 87—0210 cons.

Opinion filed December 15, 1988.

Harvey J. Barnett & Associates, Ltd., and Pope, Ballard, Shepard & Fowle, Ltd., both of Chicago, for petitioners.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Eddie Santiago, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Stephen Stern, of Legal Assistance Foundation of Chicago, of Chicago, for respondents Albert Fletcher and Barbara Fletcher.

JUSTICE McMORROW delivered the opinion of the court:

Jack Turner (Turner) and his wife, Maria, seek appellate review of the order of the Illinois Human Rights Commission (the Commission) finding that Turner racially discriminated against Albert and Barbara Fletcher (the Fletchers) with respect to the rental of Turner's home to the Fletchers. Turner's real estate agent, Re-Max Unlimited, Inc. (Re-Max), seeks appellate review of the Commission's order finding that Re-Max also racially discriminated against the Fletchers. The Fletchers also seek review of the Commission's order awarding them monetary damages and attorney fees. Because we conclude that the Commission's decision against Turner and Re-Max is not supported by the record, we reverse the Commission's orders.

BACKGROUND

The hearing before the administrative law judge revealed the following factual evidence. Jack Turner, a white male in his late thirties, is the office manager of a firm in downtown Chicago that invests in United States government securities and money market instruments for corporate clients. Prior to the spring of 1983, Turner and his family lived in a home in Palatine (the Palatine house or the Palatine home). In mid-March of 1983, Turner approached Toni O'Malley (O'Malley) of Re-Max, a realtor, about buying a new home. He wanted to move because he had a substantial increase in salary and preferred to live in a larger home with more surrounding property.

When he originally spoke to O'Malley, Turner had not decided what he was going to do with his current Palatine home. He and O'Malley discussed selling rather than renting the Palatine home, the general economic outlook in the residential real estate market in the area, and how the Palatine house "would show." O'Malley told him the market was slow, that his house had not appreciated in value since he purchased it, and that it was unlikely the value of the home would appreciate substantially in the near future. O'Malley observed that the Palatine home would rent well because it was in mint condition and that it was a good investment for Turner to retain. She also noted that it might be possible to sell the Palatine house at a higher than market value if the terms of sale were structured with a low down payment and purchaser assumption of Turner's Veterans Administration mortgage upon the house. Turner reached no conclusion whether to sell or rent the Palatine home based upon these March 1983 conversations with O'Malley.

In April, Turner spoke to his accountant. Turner had a substantial increase in salary in 1983 and had elected to defer the remainder of his salary until 1984. Turner wanted to shelter as much income as feasible during 1983, because of the increase he had received. Turner spoke to his accountant in general terms about the relative advantages of rental or sale of the Palatine home, including general information regarding the tax considerations of each alternative. On April 25, Turner signed a contract to purchase a house in Inverness (the Inverness house or the Inverness home).

A few weeks later, on May 9, Turner decided to rent that Palatine home and signed an agreement with O'Malley to act as his agent in the rental of the property. At the hearing, Turner specified three reasons for his decision to rent the Palatine home. Initially, Turner was uncomfortable about leaving the home vacant. In addition, he

was concerned about the economic outlook in the residential real estate market and high interest rates and thought he should have someone live in the house until "things perked up" in the market. Lastly, based on conversations with his accountant, Turner thought that rental could create some tax write-offs on the house. Turner's wife played no part in the decision to rent or sell the house in Palatine.

Thereafter the Palatine house was placed on the rental market. Because Turner was frequently not at home, he did not know who, other than the Fletchers, might have seen the house with the prospect of renting it. O'Malley testified at the hearing that the house was shown for possible rental to five families, excluding the Fletchers, and that none of these others applied for rental of the Palatine home.

Sometime in mid-May Turner again spoke with his accountant. The discussion covered three areas with respect to rental of the Palatine house. First, the accountant told Turner that there should be substantial appreciation in the property to make it economically feasible to rent. Turner responded that there did not appear to be any more appreciation left in the value of the house. The accountant also advised Turner that improvements to the property could be deducted for tax purposes, but only over a period of years rather than in one lump sum. The accountant further informed Turner that ideally he should have a positive cash flow, although the accountant thought he could absorb minor amounts of negative cash flow in some situations where appreciation would be substantial. Turner observed that there would be a negative cash flow of about $350 per month. The accountant advised Turner that if the negative cash flow were too large, Turner probably should not rent the property. However, the accountant did not decide the matter, and the final conclusion was left up to Turner. Months later, in October, the accountant found a real estate tax shelter for Turner.

On Saturday, May 21, 1983, the Fletchers came to see the Turners' Palatine home accompanied by Lisa Trejo (Trejo), a sales associate with Red Carpet Duvall Carousel Realtors. The Fletchers are a married black couple in their early forties with a young son. They had purchased and lived in homes in Detroit, Michigan; Glendale, Wisconsin; Atlanta, Georgia; Troutwood (suburb of Dayton), Ohio; and Bourbonnais (suburb of Kankakee), Illinois, before moving to the Chicago area in 1983. Their most recent move was occasioned by Fletcher's acceptance of a position as divisional manager of human resources at a firm in Wheeling in late 1982. Fletcher had initially

moved to a furnished apartment in Schaumburg with the intention that his family would join him in a few months. In March 1983, Fletcher's wife and son relocated from Bourbonnais to the Chicago area. The family placed most of their belongings in storage and lived temporarily in the furnished Schaumburg apartment. They began looking for a home which they could rent near Fletcher's place of employment and expected to find a suitable rental house within a few months. At the hearing, Fletcher specifically stated on a direct examination that, initially, they only wanted to rent a home rather than purchase one. The Turners' Palatine home was the third prospective rental they viewed with Trejo.

As the Fletchers and Trejo arrived in front of the Palatine house and approached the doorway, one of Turner's neighbors, who was white, was raking the yard of a nearby home. Three or four other people were in the immediate vicinity, either on the sidewalk or in front of houses. All of them were white. Fletcher noticed that, in Fletcher's words, "the eyes, then, were cast upon us, particularly of the neighbor who was raking. And some of the other people stopped, apparently, what they were doing and focused their attention on us." Fletcher also testified, however, that none of these individuals stared or gaped at them.

Turner was in the garage when they arrived and let them into the home. At one point during the Fletchers' tour of the residence, the Fletchers questioned Turner if it would be all right if they tapped into the gas line to install the Fletchers' gas dryer. Turner responded that this was acceptable. Turner also told the Fletchers that he, Turner, would maintain the lawn.

Once they had viewed the home with Trejo, the Fletchers told Trejo that they wanted to rent the house. Trejo and the Fletchers went to the Re-Max office where O'Malley worked. O'Malley was not there, but Trejo and the Fletchers stayed to complete the necessary documents for the Fletchers' application to rent the house. The Fletchers filled out a credit application while Trejo drafted a one-year lease agreement between Turner and the Fletchers. At the request of Fletcher's wife, Trejo also telephoned Turner and asked for the assurance that the house would not be put up for sale while a tenant lived there because they did not want prospective purchasers walking through the house while they were living there. Turner agreed that he would not try to sell or show the home while it was being rented.

Trejo left the Fletchers' completed credit application and the draft lease agreement at the Re-Max office with a note that the doc-

uments should be given to O'Malley. The Fletchers also left a $35 check to pay for the credit application. The Fletchers did not sign the draft lease that was left at the Re-Max office because Trejo told them that they should wait until their credit application was approved before signing the lease. Trejo said that processing of the credit application would take three to five days. Trejo had no conversation with O'Malley between May 21 and 25 about the Fletchers' rental of the Palatine home.

Turner testified that persons of various ethnic, racial, and religious backgrounds lived in the Palatine neighborhood. He stated that he received no complaints from his neighbors about the Fletchers' presence to view the Palatine house or about the Fletchers' rental of the premises. He also did not receive any objections from his employer or any of his friends. Neither Turner nor his wife had any reluctance or misgivings about renting to the Fletchers because of their race. As evidence that his behavior in the past had been nondiscriminatory, Turner testified to specific instances demonstrating good working and personal relationships with persons of various racial backgrounds, including blacks, and noted that at the time of the hearing he and his wife were in the process of adopting a Korean child.

Four days after the Fletchers viewed the Palatine home, on May 25, Turner telephoned O'Malley to tell her that he had decided to sell rather than rent the Palatine house. Turner explained that the change from rental to sale was for tax reasons, on the advice of his accountant. Turner was aware the Fletchers had already filed a credit application to rent the Palatine home, but did not learn that the application had been approved until after he had told O'Malley he no longer wanted to rent the house. Turner told O'Malley that the Fletchers should be asked, through Trejo, if they wanted to purchase the home.

Turner decided to sell the Palatine house either the evening before or the morning of the day that the closing on his Inverness house occurred on May 25. Turner had given his real estate lawyer power of attorney and was not present at the closing. In order to purchase the Inverness house, Turner paid a large sum in cash and obtained a substantial short-term loan from an area bank. Although this bank did not require that Turner sell the Palatine home, the bank advised him shortly before closing that the bank would be "concerned" if he later applied for a mortgage while owning both houses.

After Turner spoke to O'Malley, she telephoned Trejo and told her the Fletchers' credit application had been approved but that

Turner wanted to sell the property. At the hearing, Trejo recalled that O'Malley told her the Turners decided to sell on the advice of their accountant for tax reasons. O'Malley testified that she then "pitched"[1] Trejo about the Fletchers' buying the Palatine home, noting to Trejo that the Fletchers' credit was good, the house would probably sell at around $100,000 or more, and that it would take a small amount of cash to assume the Veterans Administration mortgage on the house. However, Trejo could not recall if O'Malley asked or requested that Trejo find out whether the Fletchers were interested in buying the house. Trejo also did not recall whether O'Malley told her what terms of sale Turner was asking for the Palatine home. Trejo testified that O'Malley might have said these things to her, but that she just did not recall.

After her telephone conversation with O'Malley, Trejo called Fletcher's wife, telling her the credit application had been approved but that the Turners had decided to sell their home for tax reasons on the advice of their accountant. Fletcher's wife was upset; she explained to Trejo that the family liked the area, liked the home, and wanted to live in the Palatine house. Initially, Trejo testified that she tried to "pitch" to Fletcher's wife that they purchase the home. Fletcher's wife responded that they were not interested in buying the home, because they had just relocated and were not certain how long they would be in the neighborhood. Fletcher's wife said she was going to talk to her husband. In subsequent testimony, however, Trejo said she could not remember telling the Fletchers that the house was available for sale to them, although she probably did tell them that.

Fletcher telephoned Trejo shortly thereafter. According to Trejo, Fletcher told Trejo he wanted to know "what was going on." Trejo told him that their credit had been approved and the Turners had decided to sell because their accountant advised them to sell for tax purposes. Fletcher was very upset at the time. He wanted to know why the Turners had changed their minds "all of a sudden" after the Fletchers had been there to see the house. Fletcher told Trejo that he thought that Turner was discriminating against him because he was black. Trejo responded that the Turners were not her clients and that she did not know them. Trejo also then testified that she told

---

[1] As appears from the transcript of the hearing, the word "pitch" is a term of art in the real estate sales industry, and means in that context "to sell, peddle, or advertise *** in a high-pressure way ***." Webster's Third New International Dictionary 1724 (1981).

him the house could be sold to him if he were interested in buying it. Trejo testified that Fletcher replied they were not interested in buying, because they had just relocated and did not know whether they were going to be in the area for a year or two or just a few months.

According to O'Malley, Trejo telephoned her later that day and told her the Fletchers were upset and threatening to telephone O'Malley. O'Malley responded that she would be happy to talk with them and suggested Trejo tell them to call her. Trejo also told O'Malley the Fletchers were not interested in buying the home and were only interested in rental property. Trejo never called the Fletchers to inform them that O'Malley would be willing to talk with them further. O'Malley did not telephone the Fletchers directly because she felt it would be a breach of ethics for her to deal directly with the clients of another real estate broker. The Fletchers' check for the credit application was returned to them prior to negotiation.

According to the Fletchers, Trejo never told them that they could purchase the property. After they had spoken to Trejo, they became, in Fletcher's words, "convinced in my mind that there was an irregularity that had occurred." The following day, the Fletchers went to the office of the Illinois Department of Human Rights and lodged a complaint so that the matter could be fully investigated. The Department directed the Fletchers to the Leadership Council, which suggested a "test" where both a black couple and a white couple would attempt, at different time, to view the Palatine home and place a rental application for the residence. The Fletchers refused the council's suggestion that they "test" the property and were later informed by the council that the Palatine house had been rented to "non-whites." Thereafter the Fletchers learned that the Palatine home had been sold to a white couple.

Each of the members of the Fletcher family testified that the experience damaged them emotionally, affected their family and personal lives, inhibited their social activities, and caused them the embarrassment of having to explain to others that they had not been permitted to live in a beautiful home they knew they could afford financially. It also made Fletcher less effective on his job. As of the date of the hearing, the Fletchers had not attempted to purchase a home, because they were fearful that they might undergo an experience similar to that which they had suffered with respect to rental of the Palatine house. After the instant suit was filed, Fletcher accepted a position with a different firm in the Chicago area, where he would be responsible for human resource operations in both the United States and Canada. Fletcher stated that he considered the

new position a "career move" and a "promotion."

On June 3, 1983, approximately 10 days after Turner decided to sell the Palatine home rather than rent it, Turner sold the Palatine home for $105,000 to a white couple. Turner did not know the race of the purchasers when he entered into the contract of sale and learned they were white only a few days before closing. Turner originally paid $98,900 for the Palatine house, with a Veterans Administration mortgage for $97,500 at an 11.5% interest rate, and the buyers assumed the balance of this mortgage. The purchasers made no down payment on the property; instead, the down payment was provided as a loan from Turner to the buyers. Under Turner's agreement with them, the purchasers were to make interest payments of $80 a month for a period of two years, and pay the $8,000 principal, loaned to them by Turner, in June 1985. The loan carried a 12% interest rate. Turner also paid the real estate commission when the Palatine house was sold, in the amount of approximately $6,500, by withdrawing funds from a money market account.

Turner said that he agreed to the no-money-down transaction because the money he loaned to the purchasers was in a money market account earning only 8% or 9% interest. The loan to the buyers, in contrast, increased his yield to 12% and allowed him to sell the Palatine house for more than it was worth. Based on conversations with O'Malley about the value of comparable houses in the area, Turner thought the Palatine house was worth around $100,000. Turner acknowledged that if he had left the money in a money market account, he could have withdrawn it; by loaning the money to the purchasers, however, Turner no longer had access to the funds.

Fletcher was asked if he would have been interested in buying the Palatine house if it had been offered to him in May 1983 on terms of the assumption of a $97,500 mortgage at 11.5% interest and an $8,000 second mortgage at 12%. He responded that "from a business standpoint, it would have made very good sense for me to do so." He acknowledged that he had no reason to take the second mortgage, because he had those funds in the bank, from the $14,000 gained from the sale of the Fletchers' house in Bourbonnais. When asked a similar question during the hearing about her interest in buying the house if it had been offered, Fletcher's wife responded that if the house had been offered to her for sale by the Turners, "I would not be sitting here today." Fletcher's wife also explained that she wanted to rent the Palatine house so that, if the house were put up for sale, the Fletchers would have early notice and first opportunity to buy the home if they so desired.

Based upon this evidence, the administrative law judge determined that the Fletchers had established a *prima facie* case of racial discrimination against Turner, that Turner had articulated a nondiscriminatory reason for the decision to sell the Palatine home rather than rent it, and that the Fletchers had proven that Turner's "articulated justification was a pretext for unlawful discrimination." The administrative law judge also found that Re-Max had engaged in racial discrimination, on the ground that O'Malley "made no significant effort to interest the Fletchers, either directly or through Trejo, in making a bid to purchase the [Palatine] property." Thereafter the Commission, with one member dissenting, entered an order adopting the views of the administrative law judge. Turner and Re-Max now seek direct appellate review of the Commission's decision.

OPINION

On appeal, Turner contends that the Fletchers failed to establish a *prima facie* case that Turner's decision to sell rather than rent the Palatine home was motivated by racial discrimination. Turner also argues that the evidence shows that his reason for this change of mind was a legitimate, nondiscriminatory concern over his financial arrangements. Re-Max asserts that it was not liable for racial discrimination in the incident. The Fletchers respond that the Commission's order is amply supported by evidence appearing in the record.

■ The Illinois Human Rights Act (the Act) provides that it is a civil rights violation for a real estate owner or broker to refuse to engage in a real estate transaction, including rental of real property, because of unlawful discrimination against a person by virtue of his race. (Ill. Rev. Stat. 1985, ch. 68, pars. 1—103(Q), 3—101(B), 3—102.) Because the Act is similar in language and intent to the Fair Housing Act (42 U.S.C. §3601 *et seq.* (1977 & Supp. 1986)),[2] we may consider judicial interpretations of this statute in resolving the issues presented in this appeal. "This approach is consistent with our practice of looking to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute." *Zlokower v. Comm'n on Human Rights & Opportunities* (1986), 200 Conn. 261, 264-65, 510 A.2d 985, 987; see also, *e.g.*, *Department of Corrections*

---

[2]The Fair Housing Act states in pertinent part that it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race ***; *** [or] [t]o represent to any person because of race *** that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available." 42 U.S.C. §§3604(a), (d).

*v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138.

 In applying the Federal Fair Housing Act to cases regarding discriminatory intent in the sale or rental of housing, courts have borrowed from the analysis regarding employment discrimination enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, and *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.[3] Under *McDonnell Douglas* and *Burdine*, the petitioner has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If the petitioner succeeds, the respondent must then articulate some legitimate, nondiscriminatory reason for its decision. If the respondent carries this burden of production, the presumption of discrimination drops from the case and the petitioner must prove by a preponderance of the evidence that the legitimate reason offered by the respondent was not its true reason and is a pretext to unlawful discrimination. *Burdine*, 450 U.S. at 253-55, 67 L. Ed. 2d 215-16, 101 S. Ct. 1093-94; *McDonnell Douglas*, 411 U.S. at 802-04, 36 L. Ed. 2d at 677-79, 93 S. Ct. at 1824-26.

 ▉ In order to establish a *prima facie* case, a petitioner is generally required to show that: (1) the petitioner is a member of a protected group; (2) the petitioner applied for an opportunity and was qualified for the opportunity; (3) the opportunity was denied to the petitioner; and (4) after the opportunity was denied, the opportunity was offered to others not in the protected group. (*Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802, 36 L. Ed. 2d at 677, 93 S. Ct. at 1824.) These factors establishing a *prima facie* case raise an inference of discrimination "because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." (*Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 577, 57 L. Ed. 2d 957, 967, 98 S. Ct. 2943, 2949-50.)

---

[3]The Fletchers did not argue that the actions of Turner and Re-Max would have a discriminatory impact, but rather that the actions were motivated by a discriminatory intent. Consequently we do not consider the applicability of United States Supreme Court decisions regarding the burdens of proof and persuasion in cases alleging racially discriminatory impact. (See, *e.g., Watson v. Fort Worth Bank & Trust Co.* (1988), 487 U.S. _____, 101 L. Ed. 2d 827, 108 S. Ct. 2777.) Also, neither Turner nor the Fletchers assert that this case involves "mixed [*i.e.*, discriminatory and nondiscriminatory] motives" on Turner's part, and we consequently do not consider jurisprudence applicable to such inquiry. See, *e.g., Hopkins v. Price Waterhouse* (D.C. Cir. 1987), 825 F.2d 458, *cert. granted* (1988), 485 U.S. 933, 99 L. Ed. 2d 268, 108 S. Ct. 1106.

The elements required to prove a *prima facie* case are not inflexible, as "[t]he facts necessarily will vary in [each] case and the specification *** of the *prima facie* proof required *** is not necessarily applicable in every respect in different factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13, 36 L. Ed. 2d at 677 n.13, 93 S. Ct. at 1824 n.13.

Based upon these precedents, Federal courts have fashioned various standards to determine whether the petitioner presented a *prima facie* case of unlawful discrimination in the rental or sale of housing. See, *e.g., Hamilton v. Svatik* (7th Cir. 1985), 779 F.2d 383, 387, citing *Kaplan v. 442 Wellington Cooperative Building Cooperation* (N.D. Ill. 1983), 567 F. Supp. 53, 56 ("a plaintiff establishes a prima facie case by showing that (1) she belongs to a minority; (2) the defendant was aware of it; (3) the plaintiff was ready and able to accept defendant's offer to rent; and (4) the defendant refused to deal with her"); *Robinson v. 12 Loft Realty, Inc.* (2d Cir. 1979), 610 F.2d 1032, 1038 (in order to prove a *prima facie* case of racial discrimination, petitioner must show that "(1) [the applicant] is Black; (2) that he applied for and was qualified to rent or purchase the housing; (3) that he was rejected; and · (4) that the housing opportunity remained available"); *Phillips v. Hunter Trails Community Association* (7th Cir. 1982), 685 F.2d 184, 190 (same); *Phiffer v. Proud Parrot Motor Hotel, Inc.* (9th Cir. 1980), 648 F.2d 548 (same); see generally Ill. Rev. Stat. 1985, ch. 68, pars. 3—102(A), (B), (D); 42 U.S.C. §3604(a) (refusal to deal); Ill. Rev. Stat. 1985, ch. 68, par. 3—102(E); 42 U.S.C. §3604(d) (housing remained available); see also *Chestnut Realty v. Comm'n on Human Rights & Opportunities* (1986), 201 Conn. 350, 360-62, 514 A.2d 749, 755.

To rebut an inference of racial discrimination which may have been created by the Fletchers' evidence in support of their *prima facie* case, Turner submitted testimony to show that he was motivated by a legitimate, nondiscriminatory reason: his concern over the tax and financial consequences of rental rather than sale of the Palatine home. The Fletchers do not argue that Turner's evidence of a legitimate, nondiscriminatory reason was inadequate to rebut their *prima facie* case. (See *Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093.) Rather, the Fletchers contend that the reason given by Turner was a pretext to unlawful discrimination because it was unworthy of credence. See *Williams v. Williams Electronics Inc.* (7th Cir. 1988), 856 F.2d 920, 923, quoting *Burdine*, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095 ("[a] pretext may be demonstrated 'either directly by persuading the court that a discriminatory reason more likely motivated the [respondent] or indirectly by showing that the [respond-

ent's] proffered explanation is unworthy of credence' ").

██ In order to prevail on the theory that Turner's proferred reason was unworthy of credence, the Fletchers bore the ultimate burden of proving by a preponderance of the evidence that their race was "a determining factor" in Turner's decision not to rent the Palatine home to the Fletchers. *Williams,* 856 F.2d at 923; see also *North v. Madison Area Association for Retarded Citizens* (7th Cir. 1988), 844 F.2d 401, 406 (inquiry is whether discriminatory intent was a "but for" cause for respondent's actions); *Svatik,* 779 F.2d at 387 ("motivating consideration"); *Chromium Corp. v. Human Rights Comm'n* (1987), 165 Ill. App. 3d 716, 723, 520 N.E.2d 723, *appeal denied* (1988), 119 Ill. 2d 554; *St. Mary of Nazareth Hospital Center v. Curtis* (1987), 163 Ill. App. 3d 566, 571, 516 N.E.2d 813, *appeal denied* (1988), 119 Ill. 2d 575, quoting *Pollard v. Rea Magnet Wire Co.* (7th Cir. 1987), 824 F.2d 557, 559 (petitioner " 'must show not only a false [or unusual] reason but also a causal chain in which race *** plays a dispositive role' "); *cf. Hopkins v. Price Waterhouse* (D.C. Cir. 1987), 825 F.2d 458, *cert. granted* (1988), 485 U.S. 933, 99 L. Ed. 2d 268, 108 S. Ct. 1106 (noting variation among Federal circuits in degree to which unlawful discrimination must be a factor in respondent's adverse action).

██ Our review of the record reveals no facts to support a reasonable inference that Turner's reason for sale rather than rental of the Palatine home was motivated in significant part by racial discrimination against the Fletchers. The Commission concluded that a reasonable inference of racial discrimination was supported by the record because "the timing of the sudden withdrawal of the [Palatine] house from the rental market" was an "arbitrary and idiosyncratic" decision by Turner and occurred "just as the Fletchers were in a position to take possession" of the home. We disagree.

██ In determining whether a respondent's proferred reason is unworthy of credence, it is not the role of the administrative law judge, the Commission, or this court upon review to "determine whether the [homeowner] exercised prudent business [or financial] judgment. [Citation.] We determine only whether [the homeowner's] decision actually involved an *attempt* to [rent or sell the residence] on the basis of [nondiscriminatory] considerations and was *genuinely and honestly made.* [Citation]." (Emphasis added.) (*Williams,* 856 F.2d at 924.) As a result, the circumstance that Turner's decision to sell the Palatine home may not have been a prudent financial decision does not reasonably justify an inference of unlawful discrimination. Nor does the racial difference between Turner and the Fletchers reasonably support an inference that unlawful discrimination was a dispositive factor in Turner's exer-

cise of judgment. (*Cf. Phillips v. Hunter Trails Community Association* (7th Cir. 1982), 685 F.2d 184.) The court observed in *Kaplan v. 442 Wellington Cooperative Building Corp.* (N.D. Ill. 1983), 567 F. Supp. 53, 59:

"A *** case [of racial discrimination in the rental or sale of housing] is never to be made out on the mere suspicion that because the plaintiff's minority status is known to the defendant, the defendant's action rejecting the plaintiff necessarily resulted at least in part from some pre-existing bias. It was not the intent of [the drafters of the Acts] to give any factual weight whatsoever to mere suspicions. Suspicions in this area of interplay among the peoples of a pluralistic society are understandable reactions ***, but in cases like these the court should proceed no further when it finds as here that the complainants' charges rest on nothing more."

Significant and uncontroverted evidence presented at the hearing, of which the administrative law judge and the Commission made no note or observation, demonstrates that Turner's decision was not motivated by racial discrimination. It is uncontradicted that Turner agreed to modify his Palatine home in order to accommodate the Fletchers' rental of the property, agreed to assume responsibility for lawn care of the premises, and agreed to delay any attempt to sell or show the house for a period of one year. Had Turner not wanted to rent the home to the Fletchers because of their race, Turner easily could have avoided such rental by refusing the terms requested by the Fletchers. Turner's agreement to the Fletchers' terms indicated that his decision to sell the home was not racially motivated.

It is also significant that Turner specifically told his real estate agent, O'Malley, to offer the home for sale to the Fletchers. Although the Fletchers testified that Trejo never told them that the house was being offered to them for sale, Trejo's apparent failure to repeat the offer to the Fletchers does not negate the testimony of both Turner and O'Malley that the offer to sell to the Fletchers was in fact made to Trejo, and Trejo never denied that O'Malley told her the Fletchers should be offered the opportunity to purchase the Palatine home. Had Turner wished to prevent the Fletchers from living in the Palatine home because of the Fletchers' race, Turner would not have told O'Malley to offer the home for sale to the Fletchers. It is also uncontroverted that Turner did not know the race of the subsequent purchasers of the Palatine home until shortly before closing. Thus it is apparent that during the time in which Turner negotiated the terms of the sale of his Palatine home, he did not know the race of the buyers.

As a result, the record does not support the inference that Turner somehow "cut a deal" with the white couple so that they could buy the house because they were white.

In light of the foregoing circumstances, and after a close review of all of the evidence, we are unable to conclude that the Commission's decision against Turner is factually supported in the record. Accordingly, we reverse the Commission's orders against Turner. Because of this disposition, we need not and do not consider Turner's argument that the Fletchers failed to establish a *prima facie* case of racial discrimination.

■ The Commission and the administrative law judge also found that Re-Max had engaged in unlawful discrimination in the Fletchers' rental or purchase of the Palatine home. To rebut the evidence in support of the Fletchers' *prima facie* case (see Ill. Rev. Stat. 1985, ch. 68, pars. 3—102(A), (C), (D), (E))), O'Malley offered the explanation that she informed Trejo that the Fletchers should be offered the Palatine house for sale and that she "pitched" to Trejo that the Palatine home would be an advantageous purchase for the Fletchers which they would be qualified to buy. O'Malley testified without contradiction that she was informed by Trejo that the Fletchers were not interested in buying the Palatine home.

The recommended order of the administrative law judge made no finding contrary to O'Malley's testimony, but found that Re-Max engaged in racial discrimination on the sole premise that O'Malley "made no significant effort to interest the Fletchers, either directly or through Trejo, in making a bid to purchase the [Palatine] property." However, as stated, O'Malley had been told by Trejo that the Fletchers were not interested in buying the property. We cannot say on this record that O'Malley's failure to pursue the matter any further, either indirectly through Trejo or directly with the Fletchers, reasonably supports an inference of racial discrimination by O'Malley. (See *Duckett v. Silberman* (2d Cir. 1978), 568 F.2d 1020, 1024.) As a result, we reverse the Commission's orders against Re-Max. In view of this disposition, we do not address the merits of the Fletchers' cross-appeal.

For the reasons stated, the orders of the Human Rights Commission are reversed.

Reversed.

JIGANTI, P.J., and JOHNSON, J., concur.