2021 IL App (1st) 200865-U

No. 1-20-0865

Order filed July 16, 2021

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| HELENE TONIQUE WILLIAMS, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Illinois Human |
| | ) | Rights Commission. |
| v. | ) | |
| | ) | |
| THE HUMAN RIGHTS COMMISSION, | ) | Charge No. 2019 CH 0995 |
| THE DEPARTMENT OF HUMAN RIGHTS, and | ) | |
| A SAFE HAVEN FOUNDATION, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE HARRIS delivered the judgment of the court.
Justice Connors and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The decision of the Human Rights Commission sustaining the Department of Human Rights's dismissal of petitioner's charge of housing discrimination based on a lack of substantial evidence is affirmed.

¶ 2   Petitioner Helene Tonique Williams appeals *pro se* from a final decision of the Human Rights Commission (Commission) sustaining the Department of Human Rights's (Department)

dismissal of her charge of housing discrimination for lack of substantial evidence. For the reasons that follow, we affirm.

¶ 3    On January 2, 2019, petitioner filed a *pro se* claim of housing discrimination with the Department. In the complaint, petitioner alleged that A Safe Haven Foundation (Safe Haven), which provides transitional housing, discriminated against her on the basis of her race (black). She alleged that on December 19, 2018, when she returned from work, she was given her personal belongings and not allowed inside. She alleged that in her absence, white residents falsely accused her of making threats to them. Petitioner claimed that those residents had threatened her with bodily harm but were allowed to continue residing at Safe Haven. According to petitioner, Safe Haven did not investigate, "took the other residents' word," and ignored her complaints.

¶ 4    The Department investigated the charge. An investigator reviewed numerous documents, conducted two interviews with petitioner, and interviewed Safe Haven's legal counsel and two of Safe Haven's program managers. The Department issued an investigation report on April 11, 2019.

¶ 5    Petitioner told the investigator that she began living at Safe Haven on December 12, 2018, with the intention to stay until her veterans' assistance benefits were approved. When those benefits were denied, Safe Haven agreed to allow her to stay during the appeal process. Safe Haven did not give her a specific time frame for her stay at its facility.

¶ 6    According to petitioner, there were "a lot of Puerto Rican girls" at Safe Haven who were very noisy throughout the day and who called the black women names, such as "bitches and whores." Petitioner asked the Puerto Rican women to be quiet. In response, one of the Puerto Rican women started threatening her. On December 17, 2018, petitioner and this woman had a verbal altercation. Petitioner's roommate called security. When security personnel arrived, petitioner told

them what happened. Petitioner stated that while she was at work, the Puerto Rican women "lied on her." When she returned from work on December 18, 2018, security gave petitioner her personal belongings and told her she had to leave.

¶ 7 Petitioner stated that on December 19, 2018, she returned to Safe Haven, but security did not allow her to speak to any of the staff. However, she also stated that when she went to Safe Haven on that date, she spoke with Rodney Bates, a program manager who provided assistance for veterans. She said that Bates attempted to speak to staff, but she was not allowed to go into the office with him.

¶ 8 Petitioner asserted that she was discriminated against due to her race when Safe Haven made her leave the facility. She stated that her roommate, who was black, was not made to leave. The Puerto Rican women with whom she had an altercation also were not made to leave.

¶ 9 The investigator interviewed Safe Haven's legal counsel, Elizabeth Donohue. Donohue explained that Safe Haven is a not-for-profit corporation. The facility consists of 406 beds in 116 rooms, with a total capacity for 210 men, 69 women, and 127 children. Donohue stated that 87 rooms were occupied by black individuals, and 77% of the resident population was black.

¶ 10 Sherise Nicholas, a program manager, told the investigator that Safe Haven was a homeless shelter. She stated that when petitioner was admitted to the facility on December 12, 2018, she was required to complete an intake process in order to determine what programs she needed. Petitioner refused to go to the intake office even though Nicholas and a case manager, Marshell French, asked her to complete the intake process twice within 24 hours of her arrival, and French continued to tell petitioner to do so. Nicholas stated that due to petitioner's failure to complete the intake process, Safe Haven was unable to determine what services petitioner needed.

¶ 11    Nicholas stated that around December 14 or 15, 2018, she placed a note on petitioner's bed, informing her that it was mandatory to meet with the intake department. Petitioner eventually completed the intake process on December 18, 2018. However, she still needed to meet with French to complete other assessments that were required in order to participate in Safe Haven's program. Specifically, there would be questions to determine the level of care petitioner needed, "for example needing glasses, to go to the dentist, employment etc." French made requests to petitioner to meet "during the entire time she participated in the program," but petitioner refused to meet with her.

¶ 12    Nicholas told the investigator that Safe Haven had no record of petitioner getting into an altercation with any of the other residents, or of security being called due to an altercation in which petitioner was involved. According to Nicholas, any time security is involved in an incident, a note is made by staff and a report is made. No notes or reports were made by security or staff about an altercation involving petitioner. In addition, petitioner's roommate did not report any altercations between petitioner and any other residents. The roommate did alert staff that at some point, petitioner was looking at her email, indicating that "someone she had charges against was being released from lock up and they better not try to come to [Safe Haven's] facility to hurt her." The roommate reported to staff that the statements she overheard petitioner make made her feel uncomfortable. Staff spoke to petitioner, who denied she was threatening anyone, and monitored her overnight. On December 20, 2018, petitioner left the facility without authorization and no one knew where she was. Petitioner was not told to leave the facility, but rather, left on her own. Nicholas stated that petitioner never returned.

¶ 13    According to Nicholas, petitioner did not come to Safe Haven on a veterans' program because she did not meet the qualifications to do so. Instead, Safe Haven offered to have petitioner come in under the "Interim Housing Program," which is for single women with and without children, men, and families that are homeless. Nicholas stated that Safe Haven has asked other residents to leave its facility for various reasons. Most of the individuals asked to leave were black because 75% of the people at the facility are black.

¶ 14    The investigator spoke with petitioner a second time. During this interview, petitioner stated that on December 17, 2018, the Puerto Rican women in the room next to hers were loud. She asked them to be quiet because she and her roommate had to go to work. The Puerto Rican women proceeded to "curse [petitioner] out." In the hallway, petitioner told one of the women that "she was not going to be threatening her, and she was not afraid of her." Petitioner and the other woman went back into their respective rooms. After this "altercation," petitioner's roommate left to report the incident to security. Security personnel came to petitioner's room, told her that her roommate was scared, and asked what was going on. Petitioner told them about "having words" with the Puerto Rican woman in the hall. The security personnel told her if anything like that happened again, she should report it to management. According to petitioner, they did not "do any type of report."

¶ 15    Petitioner denied that she was reading email, that she made any comments about someone being released who she "had charges against," that she said such a person had better not try to come after her, or that she made any other threats.

¶ 16    Petitioner stated that she knew the Puerto Rican women "lied on her" because security personnel told her the women "said the incident between them occurred outside." They indicated

that petitioner was in a smoking area and told them to come outside because she had something for them. Security personnel told petitioner "that is why she had to go." According to petitioner, she told the security personnel that she was not outside, as no one was allowed to go outside by themselves, but rather, had to be escorted by staff. Petitioner told security personnel that "they were taking sides and they just wanted her to leave the facility."

¶ 17    Petitioner stated that when she arrived at Safe Haven and was told she had been discharged, she saw Rodney Bates. She told Bates she had been discharged from the facility, but she was not allowed to go into the office with him. According to petitioner, Bates "was trying to talk to someone to see if she would be able to stay in the facility."

¶ 18    Petitioner told the investigator that she knew the Puerto Rican women were not discharged from the program because "while she was there being told about her being put out, the [women] she was in the altercation with walked by saying ah ha." Petitioner stated that while there were "more" black individuals at Safe Haven, there were "a lot" of Puerto Ricans there as well. Petitioner denied that she left the facility on her own and stated that she was "kicked out."

¶ 19    Rodney Bates, a program manager, told the investigator that he did not know what had happened with petitioner. At one point, he saw her in the hall and she asked him for help, but he "did not know what was going on with her." He told petitioner that she was not in the veterans' assistance program because she did not qualify for it. He did not ask anyone to allow petitioner to come back because he had no control over the program that she was in. Bates stated that he did not remember everything petitioner said on the day she was discharged, but Nicholas told him petitioner left on her own.

¶ 20    Among the paperwork that the investigator reviewed was a document setting forth Safe Haven's policies. In a section titled "Welcome," the document indicated that in exchange for Safe Haven's commitment to residents, the residents were required to work with Safe Haven by, *inter alia*, following the rules. It further provided that to avoid discharge, residents should read and abide by the rules outlined in the orientation handbook, and that a violation of the rules may be cause for immediate discharge. In a section titled "Community Rules," the document provided that all residents were required to return to the facility by curfew, which is generally 7 p.m. Monday through Friday, and 10 p.m. Saturday and Sunday. It further indicated that residents must be in the facility for 30 days before "getting a pass," and that pass requests must be in writing and approved by staff.

¶ 21    The investigator also reviewed a document titled "An Agency Housing Supportive Services Checklist Report." The report indicated that petitioner entered the program on December 12, 2018, continually refused to meet with the intake department, and did not follow the program structure. The report stated that notes were placed on petitioner's bed directing her to complete her assessment on December 19, 2018, and to meet with French on December 20, 2018. On December 20, 2018, petitioner refused to stay in the facility to complete her assessment and "continued to have infraction with the rules." Finally, the report stated that petitioner "disappeared."

¶ 22    A document titled "The Agency Housing Discharge Information Sheets" also indicated that the reason for petitioner's discharge on December 20, 2018, was "disappeared."

¶ 23    On February 20, 2020, the Department dismissed petitioner's charge of housing discrimination based on race for lack of substantial evidence.

¶ 24    Petitioner filed a request for review on March 2, 2020. She submitted no additional evidence in support of the request. The Department filed a response to the request for review, recommending that the Commission sustain the dismissal. Petitioner filed a reply, asserting that she was sent to Safe Haven by a U.S. Department of Veterans Affairs social worker, and that the social worker told a Safe Haven staff member that petitioner "was working security and would need to have time out after curfew due to working at both Macy's and Gamma Team Security as a private security officer." Petitioner alleged that Safe Haven "lied about the fact I broke curfew, and didn't know about the verbal argument." She stated that security "kicked [her] out" of the program and that French did not want to meet with her regarding "the argument that took place." Petitioner further asserted that she completed her "paperwork," but French and other staff members "put it in someone else's name."

¶ 25    On July 28, 2020, the Commission issued a final order sustaining the dismissal of petitioner's charge for lack of substantial evidence. The Commission explained that petitioner failed to establish a *prima facie* case of housing discrimination because she did not show she was qualified to reside at Safe Haven or that Safe Haven treated a similarly situated resident outside her protected class more favorably. The Commission found that petitioner was disqualified from remaining a resident when she broke curfew, and that she had failed to show that a non-black resident who broke curfew was not evicted. Moreover, the Commission reasoned that even if petitioner had succeeded in establishing a *prima facie* case of housing discrimination, Safe Haven had articulated a legitimate, nondiscriminatory reason for its action, *i.e.*, petitioner broke curfew. Petitioner had failed to prove that reason was pretextual, as there was no evidence that any of Safe Haven's agents harbored racial animus.

¶ 26    Petitioner filed a timely petition for direct review in this court on August 7, 2020. 775 ILCS 5/8-111(B)(1) (West 2020).

¶ 27    In her *pro se* brief, petitioner asserts that when she arrived at Safe Haven, the staff was "made aware" that she had two jobs as a security officer. Staff told her she needed to complete her "interim process." Petitioner maintains that she did so with French, who then asked petitioner "to inform dorm staff as well as let them know about [her] two jobs and military status so [she] wouldn't have to do details/chores." Petitioner argues that she did as she was asked, but "they" used her interim application for someone else, claimed she did not update her interim status with staff, and asked her to leave the program and return her identification. Petitioner asserts that Safe Haven lied about her failure to complete her "interim process" and was trying "to pretend they never kicked [her] out."

¶ 28    As an initial matter, we note that petitioner's brief fails to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020), which governs the content of appellate briefs. Rule 341(h)(7) requires that an appellant's brief contain argument supported by citations to the authorities and the pages of the record relied on. As a reviewing court, we are entitled to have the issues clearly defined, pertinent authority cited, and a cohesive legal argument presented. *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5. "The appellate court is not a depository in which the appellant may dump the burden of argument and research." *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). Failure to cite relevant authority violates Rule 341 and can cause a party to forfeit consideration of an issue. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Moreover, when an appellant fails to comply with Rule 341, this court may strike the brief and dismiss the appeal. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 77. An appellant's *pro se* status does

not relieve her of the obligation to comply with Rule 341. *Wing v. Chicago Transit Authority*, 2016 IL App (1st) 153517, ¶ 7.

¶ 29 Petitioner's brief consists of two paragraphs. It does not include any citations to authority or to the record. Her brief does not contain the elements required by Rule 341(h)(7) and does not present an organized and cohesive argument. In these circumstances, we would be justified in striking petitioner's brief and dismissing the appeal. *Holzrichter*, 2013 IL App (1st) 110287, ¶ 77.

¶ 30 However, while the insufficiency of petitioner's brief hinders our review, meaningful review is not completely precluded, as, for the most part, the merits of the case can be ascertained from the record on appeal. This court may entertain the appeal of a party who files an insufficient brief "so long as we understand the issue [the party] intends to raise and especially where the court has the benefit of a cogent brief of the other party." *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2001). Here, the State respondents have filed a cogent brief, which this court allowed Safe Haven to adopt by reference, and it is clear that petitioner is challenging the dismissal of her charge of discrimination. Accordingly, we choose to reach the merits of petitioner's appeal.

¶ 31 The Illinois Human Rights Act (Act) provides that it is the public policy of Illinois to secure individuals from discrimination in real estate transactions. 775 ILCS 5/1-102(A) (West 2018). Real estate transactions include the sale, exchange, rental, or lease of real property. *Id.* § 3-101(B). The Act provides that it is a civil rights violation for any person engaging in a real estate transaction to "[a]lter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith" because of unlawful discrimination. *Id.* § 3-102(B).

Unlawful discrimination includes discrimination against a person because of his or her race. *Id.* § 1-103(Q).

¶ 32    Under the Act, upon the filing of a housing discrimination charge, the Department must conduct a full investigation of the allegations and prepare a written report. *Id.* § 7B-102(C)(1), (D)(1). The Department must then review the report to determine whether there is "substantial evidence" that the alleged discrimination has occurred. *Id.* § 7B-102(D)(2). "Substantial evidence," as defined by the Act, is "evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." *Id.* § 7A-102(D)(2).

¶ 33    If the Department determines that there is no substantial evidence to support the allegation, the charge is dismissed. *Id.* § 7B-102(D)(2)(a). The petitioner may seek review by the Commission of the dismissal. *Id.* The Commission may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department in response to the request. *Id.* § 8-103(B). If the Commission sustains the dismissal, the petitioner may seek review in the appellate court. *Id.* § 8-111(B)(1).

¶ 34    We review the decision of the Commission, not the Department. *Alcequeire v. Human Rights Comm'n*, 292 Ill. App. 3d 515, 519 (1997). The Commission's findings of fact are entitled to deference and "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2018). However, the Commission's ultimate decision to sustain the dismissal of a charge will be reversed only if the decision was arbitrary and capricious or an abuse of discretion. *Stone v. Department of Human Rights*, 299 Ill. App. 3d 306, 314 (1998). A decision is arbitrary and capricious if it contravenes

legislative intent, fails to consider a critical aspect of the matter, or offers an explanation so implausible that it cannot be considered as a result of the exercise of the agency's expertise. *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 33. An abuse of discretion will be found where no reasonable person could agree with the Commission's decision. *Id.* Under this standard, we may not reweigh the evidence or substitute our judgment for that of the Commission. *Id.*

¶ 35    A petitioner who alleges a violation of the Act has the initial burden of proving a *prima facie* case of unlawful discrimination by a preponderance of the evidence. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 918-919 (2010). If the petitioner succeeds in establishing a *prima facie* case, the respondent must articulate, not prove, a legitimate, nondiscriminatory reason for its actions in order to rebut the presumption. *Owens*, 403 Ill. App. 3d at 919. Then, if the respondent articulates such a reason, the burden shifts back to the petitioner to prove by a preponderance of the evidence that the respondent's reason was untrue and a pretext for discrimination. *Id.* The ultimate burden of persuasion remains on the petitioner throughout the proceedings. *Id.* A petitioner's failure to present substantial evidence of a *prima facie* discrimination claim or to disprove a respondent's articulated reason for its actions warrants dismissal of the charge. *Owens v. Department of Human Rights*, 356 Ill. App. 3d 46, 52 (2005).

¶ 36    To establish a *prima facie* case of housing discrimination, there must be evidence that (1) the petitioner is a member of a protected group; (2) the petitioner applied for an opportunity and was qualified for the opportunity; (3) the opportunity was denied to the petitioner; and (4) after the opportunity was denied, the opportunity was offered to others not in the protected group. *Turner v. Human Rights Comm'n*, 177 Ill. App. 3d 476, 487 (1988). After reviewing the record, we

conclude that petitioner failed to establish the second and fourth factors of a *prima facie* case of housing discrimination.

¶ 37    Regarding the second factor, petitioner did not meet her burden to show that she was qualified for the opportunity to remain as a tenant at Safe Haven where there was no dispute that, in violation of Safe Haven's curfew policy, she left the facility without prior authorization. The record shows that among Safe Haven's rules there was a requirement that all residents were required to return to the facility by curfew. In addition, Safe Haven's written policies provided that a violation of the rules may be cause for immediate discharge. Safe Haven allowed that after 30 days, residents could obtain a "pass," but required that such requests be in writing and approved by staff.

¶ 38    Nicholas told the Department investigator that on December 20, 2018, petitioner left Safe Haven without authorization and no one knew where she was. Internal paperwork submitted by Safe Haven corroborated that on that date, petitioner "disappeared." Petitioner did not present conflicting evidence. We are mindful that petitioner alleged, in her reply to the Department's response to her request for review, that a social worker told a Safe Haven staff member that petitioner "would need to have time out after curfew due to working." In addition, petitioner alleged in her brief that when she arrived at Safe Haven, staff was "made aware" that she had two jobs. However, petitioner did not allege or present evidence that she submitted a written request for a pass, was granted a pass, or was otherwise excused by Safe Haven from its curfew policy. Based on the evidence provided, petitioner was not qualified to remain as a tenant at Safe Haven and thus did not meet the second factor to establish a *prima facie* case of housing discrimination.

¶ 39    The fourth factor of a *prima facie* case of housing discrimination is that an opportunity that was denied to the petitioner was offered to others not in the petitioner's protected group. *Turner*, 177 Ill. App. 3d at 487. Here, there is nothing in the record showing that individuals who were not black were allowed to remain at Safe Haven despite violating the curfew policy. As such, petitioner did not meet her burden to establish this factor.

¶ 40    Petitioner failed to establish the second and fourth factors of a *prima facie* case of housing discrimination. In light of petitioner's failure to present substantial evidence of a *prima facie* discrimination claim, the Department's dismissal was justified. *Owens*, 356 Ill. App. 3d at 52. In turn, the Commission's decision to sustain the dismissal of petitioner's charge of discrimination did not contravene legislative intent, fail to consider a critical aspect of the matter, or offer an explanation so implausible that it could not be considered as a result of the exercise of the agency's expertise. See *Young*, 2012 IL App (1st) 112204, ¶ 33. We cannot say that no reasonable person could agree with the Commission's decision. See *Stone*, 299 Ill. App. 3d at 314. As such, the decision was not arbitrary and capricious or an abuse of discretion. *Id.* Petitioner's challenge to the Commission's decision fails.

¶ 41    For the reasons explained above, we affirm the decision of the Commission.

¶ 42    Affirmed.