MEMORY GARDENS CEMETERY, INC., Plaintiff-Appellant, v. THE VIL-
LAGE OF ARLINGTON HEIGHTS *et al.*, Defendants-Appellees (Wendy
Zick *et al.*, Defendants).

First District (2nd Division)   No. 1—92—1227

Opinion filed July 27, 1993.—Rehearing denied September 9, 1993.

Marks, Marks & Kaplan, Ltd., of Chicago (Robert Marks and Robert J. Dargis, of counsel), for appellant.

Altheimer & Gray, of Chicago (Jack M. Siegel, of counsel), for appellees.

Gottlieb & Schwartz, of Chicago (Harvey I. Lapin and David J. Schwartz, of counsel), for *amicus curiae*.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Memory Gardens Cemetery, Inc. (the Cemetery), applied to defendant Village of Arlington Heights (the Village) for a permit to build a mausoleum. Defendant building commissioner denied the application, and defendant zoning board of appeals (the Board) affirmed. The Cemetery then filed this declaratory judgment action, alleging that its proposed mausoleum did not require a special use permit under the Village's zoning ordinance (the Ordinance), or if it did, that the Ordinance should be declared unconstitutional. After denying defendants' motion to dismiss the declaratory judgment count and hearing the Cemetery's case in chief, the circuit court granted defendants' motion for judgment in their favor under section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110). It held, under the Ordinance, a new mausoleum in an existing nonconforming cemetery is an extension or enlargement of the nonconforming use and thus requires a separate special use permit. We affirm.

The Cemetery has been in existence since 1924. Originally in unincorporated Cook County, it was annexed in 1929 by the Village. At that time, cemeteries were not a permitted use anywhere within the Village, but in 1959 the Village passed the Ordinance, which listed cemeteries as a special use in an R-3 zone. By then, at least one mausoleum had been completed at the Cemetery; there are now 13, for none of which the Village demanded a special use permit. In 1989, the Cemetery applied for a building permit to build another mausoleum. Defendant building commissioner denied the application on the ground that a special use permit was required because under the Ordinance, a mausoleum is a special use distinct from cemeteries. The Cemetery appealed this decision to the Board.

The Board affirmed the decision, reasoning that the mausoleum would be an impermissible expansion of the nonconforming use under

the Ordinance because in the last 30 or 40 years, the percentage of the Cemetery's burial sites in mausoleums had more than doubled. It also found that the construction of mausoleums had been "a substantial or fundamental change in the nature of the non-conforming use from basically an in ground burial facility to a mausoleum-type facility with substantial structures both in number and size." The Board further concluded that "mausoleums are not included in the definition of cemetery, both in the legal sense and in the customary sense of the use of those terms" and that a mausoleum does not fall within the Ordinance's definition of an "accessory" structure in a cemetery, given that it serves the same function, not a subordinate one.

The Cemetery filed suit in June 1989 against the Village, the building commissioner, the Board (as an entity and as to its members) (collectively, the Village defendants or defendants), and certain individuals who attended the Board proceeding. Without specifically asking for review under the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—101 et seq.), the Village asked that the Board's decision be reversed and that the Village be ordered to issue the permit.

The first witness was the Cemetery's architect, Arnold Moreno, who described the Cemetery and its surroundings. He explained that there are 13 existing mausoleum structures, four of which contain two "units" of 384 crypts each and are similar to the proposed building, which would have three "units" of the same size. Using a master plan, he described the Cemetery as bordered by Euclid on the north, Waterman on the west, and Miner on the south. Across Euclid there is a country club for most of the length of the Cemetery; to its west are residential units, which also are found across Waterman and across Miner. The proposed building, which was intended for the northeast corner of the property, was to be approximately 15 feet high, 176 feet long, and 37 feet wide; it would be the largest structure on the site.

Harvey Lapin, an attorney who wrote his master's thesis on tax-exempt cemeteries and who teaches tax law as adjunct faculty at John Marshall Law School in Chicago, testified next. He also has drafted cemetery legislation for Illinois and other States and for the Federal government. Nevertheless, after voir dire by defendants, the court sustained defendants' objection to him as an expert in zoning matters. In the Cemetery's offer of proof, Lapin testified that in the industry, a cemetery is a place of final disposition of human remains, be it by earth burial, lawn crypt (below-ground entombment), mausoleum (above-ground entombment), or cremation. In his opinion, the

new mausoleum would neither change the purpose or use of the Cemetery nor constitute an expansion or enlargement of it as a legal nonconforming use.

William Pailey, Jr., who has worked at the Cemetery since 1969 and is now the Cemetery's general manager, vice-president, and treasurer, also testified. He told the court that the first burial at the Cemetery occurred in 1924 and that there have been mausoleum entombments since 1957. At the time of trial there were about 1,500 occupied spaces out of 4,100 total in the mausoleums, compared to approximately 15,500 occupied graves out of the 60,000 or 70,000 that could be accommodated in the 60% of the property laid out for in-ground burial. The 13 mausoleum buildings, 12 of which are in the southwest corner of the Cemetery, vary from 114 to 764 crypts. Through Pailey, Jr., the Cemetery entered evidence of a 1924 plat recorded with the county and of building permits from 1986, 1984, 1981, 1980, and 1973. He could not find permits for the seven mausoleums built prior to 1973.

The next witness was Thomas J. Pekras, for 15 years director of the State Comptroller's Cemetery and Burial Trust Department, which administers relevant State statutes (registration, licensing, auditing, etc.) for 5,900 of the 10,000 Illinois cemeteries. In the last 15 years, he had met over 1,000 cemeterians, attended many conferences, and visited many cemeteries, including this one. Prior to his current position, he taught English and worked for the State Board of Education. He testified that in the private cemetery industry, as in his Department, a cemetery is "a place for the final disposition through a variety of means of dead human bodies," and a mausoleum is "an above-ground structure within a cemetery where dead bodies are placed for final disposition." Over defendants' objection, he testified that in his opinion, the addition of a mausoleum to an existing cemetery thus would neither change a cemetery's nature or purpose nor extend or enlarge the use of a cemetery. To the best of his knowledge, a mausoleum was a customary facility for final disposition in Illinois in general and at the Cemetery in particular; there is no classification of cemeteries in Illinois according to method of disposition. On cross-examination, Pekras testified that all his information came from the owners of the Cemetery, whom he did not know. He had not reviewed the pleadings or other papers. He conceded that his position concerned financial management of cemetery trust funds and had nothing to do with land use. He was unfamiliar with the Ordinance.

William Pailey, Sr., the Cemetery's president since incorporation, testified that he supervised planning of the grounds for graves and

mausoleums. He believed that the first mausoleum at the Cemetery was begun in 1955 and completed in 1957. Its permit application included a plot plan for 30 proposed mausoleums along the south and west sides of the Cemetery. Between 1955 and 1989, he recounted, 12 permits had been issued for 13 mausoleums, none of which had needed a special use permit. Although the Cemetery sought to enter the statements made by the Village attorney and the Village president during a Village Board meeting involving the Cemetery's administration building, the circuit court sustained defendants' objection, agreeing that these statements were not admissible.

Pailey, Sr., also testified that in the industry, a cemetery is "the [place for] disposition of human remains and it entails entombment in mausoleums, interment in ground spaces, what we call traditional burial, and inurnment in cremation ditches [sic]," so the addition of the mausoleum would not change the Cemetery's purpose or use. Currently, he testified, there are approximately 11,000 or 12,000 occupied graves and about 1,500 or 2,000 occupied mausoleum crypts out of about 4,000 total; the mausoleum at issue would add approximately 1,000 more. In his opinion, any limit on the number of mausoleums at the Cemetery would depend on the community's needs, and a crematorium would be part of a cemetery, so the Cemetery would be entitled to construct one without a special use permit.

Donald Massaro, the executive director of cemeteries for the Roman Catholic Archdiocese of Chicago for nine years, was the next witness. He too testified that in the industry, the word "cemetery" means a place for human remains and encompasses graves, mausoleums, scattering gardens, niches, and lawn crypts; cemeteries are not classified differently depending on the presence or absence of mausoleums. In his opinion, the addition of the mausoleum at issue would not change the nature or use of the property because mausoleums are an integral part of cemeteries. In his cemeteries, 10% of the 22,000 yearly interments are in mausoleums, the first of which was built in 1957. He further believed that a crematorium should be permitted in any cemetery that wanted to build one and that there should be no limitation, other than aesthetics, placed on the number of mausoleums on a site. He was "not entirely" familiar with the Ordinance, and he conceded that he did not know the meaning of the term "nonconforming use," that he had neither examined any of the zoning ordinances his cemeteries were subject to nor knew their zoning classifications, and that he "vaguely" knew what a special-use permit was. He also admitted that a mausoleum other than a private or family one was a relatively new concept in the United States.

As its final witness, the Cemetery called Rolf Campbell, a city planning and zoning consultant for over 40 years who has been qualified approximately 150 or 200 times as an expert witness in land use matters. He has represented municipalities and on occasion has testified on behalf of the Village. He also had been involved in writing standards contained within zoning ordinances for cemeteries, including the preparation of the technical aspects of the 1976 comprehensive amendment to the Cook County zoning ordinance. He testified that there was no zoning ordinance in Cook County prior to the 1940 version and that the Village enacted its first one, which did not mention cemeteries, in 1927. When annexed by the Village in 1929, he explained, the Cemetery was "grandfathered" as a nonconforming use. In his opinion, to a reasonable degree of land use certainty, the addition of the proposed mausoleum would neither expand nor enlarge the use of the Cemetery property, nor would it change the nature of its use. To him, the limit on the number of mausoleums that could be built at the Cemetery would be the physical capacity of the land, that is, the land not occupied by graves. Campbell conceded that he had designed only two cemeteries, both in Michigan and both over 30 years ago. On cross-examination, defendants attempted to establish that zoning ordinances generally treat cemeteries and mausoleums differently, but Campbell refused to agree, citing a number of other local zoning ordinances.

The Cemetery concluded its case, and defendants orally moved for judgment in their favor. They disparaged the Cemetery's evidence as generally irrelevant on the question before the court, which they defined as whether the mausoleum represented an increase in intensity of the Cemetery's use, which would make it an expansion of the nonconforming use, necessitating a special use permit. Weighing the evidence, they argued, the court would find that the Cemetery had not sustained its burden of proof. In reply, the Cemetery highlighted the Village's own interpretation of the Ordinance, as evidenced by its granting the prior permits without requiring a special use permit, and the industry use of the word "cemetery" to include mausoleums. It also contended that constructing mausoleums merely increased business, which even under defendants' cases could not be deemed an impermissible intensification of use, or, alternatively, that this was a fact question raised by the affirmative defense and thus was inappropriate for decision at this time.

In its memorandum of opinion, the circuit court first reviewed the stipulated facts, the definition of "cemetery" in related State statutes, and the Board's decision. It found that

"mausoleums are treated separately from cemeteries under Illinois law and the Zoning Ordinance. The findings and decision of the Board were supported by the evidence and the law and they were not against the manifest weight of the evidence or contrary to law.

The proposed construction of the mausoleums [*sic*] would constitute an expansion in a nonconforming use which violates the ordinance of the Defendant Village. The Defendant Village has the authority to make mausoleums a special use under its zoning ordinance.

Accordingly, this court finds that Plaintiff is not entitled to the issuance of a building permit for the proposed mausoleum without a special use permit and that Defendant Building Commissioner and Defendant Zoning Board of Appeals did not err in applying the facts and construing the ordinance and the law."

I

■ Section 2—1110 of the Code of Civil Procedure states as follows:

"In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110.)

In applying this statute, courts are guided by *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43. There, the supreme court explained that in all cases, jury and non-jury alike, a plaintiff must make out a *prima facie* case by presenting at least some evidence on every element essential to his cause of action. If the plaintiff cannot, the defendant is entitled to judgment as a matter of law. If the plaintiff does present some evidence on each essential element of his case, however, the court, in its role as fact finder, then weighs the evidence. If this weighing results in negation of some of the evidence necessary to the plaintiff's *prima facie* case, the defendant is entitled to judgment. The supreme court further explained that the analysis used for a motion under section 2—1110 differs from that used for a directed verdict in a jury trial, as articulated in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, because when ruling on these motions, the court weighs the evidence, assesses

witness credibility, draws reasonable inferences from the testimony, and need not view the evidence in the light most favorable to the plaintiff. Thus, reversal of a ruling on such a motion is in order only if the decision is contrary to the manifest weight of the evidence. *Zannini v. Reliance Insurance Co.* (1992), 147 Ill. 2d 437, 449, 590 N.E.2d 457, 461-62.

■ Complicating the procedural posture of this case, however, is the type of question presented here, which is one of construction of a zoning ordinance, and the applicable standard of review. In this regard,

"the construction of a statute, ordinance or constitutional provision is a question of law. Accordingly, the reviewing court may make an independent determination and need not defer to the decision of the trial court. [Citation.] Zoning ordinances are to be construed the same way as statutes. [Citation.] Effect should be given to the intention of the drafters by concentrating on the terminology, its goals and purposes, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance. [Citations.] Because agencies can make informed judgments on the issues based upon their experience and expertise, it is generally recognized that courts will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute. [Citation.]
\*\*\*
A reviewing court will defer to the administrative entity's practical construction of the ordinance unless it is clearly erroneous, arbitrary or unreasonable." *Monahan v. Village of Hinsdale* (1991), 210 Ill. App. 3d 985, 993-94, 569 N.E.2d 1182, 1188 (declaratory judgment action).

See also *Scadron v. City of Des Plaines* (1992), 153 Ill. 2d 164, 185, 606 N.E.2d 1154, 1163 (court's task is to ascertain and give effect to legislature's true intent and meaning by starting with plain and commonly understood meaning of language unless otherwise intended while looking at ordinance as a whole); *County of Lake v. Zenko* (1988), 174 Ill. App. 3d 54, 60, 528 N.E.2d 414, 417 (property owners should be able to rely on zoning ordinance terms to have commonly understood, ordinary meaning unless defined or otherwise indicated).

■ We must reject the Village's challenge to the circuit court's refusal to admit certain testimony and alleged disregard for all the testimony concerning the Village's history in interpreting its Ordi-

nance, the industry's interpretation, and definitions in various statutes. As explained above, the construction of the Ordinance is a question of law, not of fact. Furthermore, not only is our review of a ruling on a question of law *de novo*, but also we seek the plain and ordinary meaning of the Ordinance's wording, for which definitions by other legislatures and in the industry offer little guidance. *City of Evanston v. O'Leary* (1993), 244 Ill. App. 3d 190, 614 N.E.2d 114 (separate legislative enactments are of little value, for they may use words differently, depending on context, legislative purpose, and practical results of particular interpretation).

## II

Addressing this question of law, the Cemetery contends that when the Village wished a particular use to be deemed separate and distinct rather than an integral part of a broader and more encompassing use category, the Village gave it a separate listing in the Ordinance's index or defined it. The Ordinance's Use Table, stresses the Cemetery, contains the words "cemeteries, crematories or mausoleums" on a single line, there is no definition for any of these terms, and there are no separate listings in the index. From these clues, the Cemetery concludes, "cemetery" and "mausoleum" are synonymous for the purposes of the Ordinance, just as "church" is synonymous with "place of worship."

We examine the Ordinance itself, which defines "use" as "[t]he purpose or activity for which the land, or building thereon, is designed, arranged or intended, or for which it is occupied or maintained, and shall include any manner or performance of such activity with respect to the performance requirements of this code." (Arlington Heights, Ill., Zoning Ordinance §3.2—151 (1959).) It also states that "[a] lawfully established use *** which becomes non-conforming with respect to this code on the effective date thereof or as a result of any subsequent amendment thereto may be continued except as otherwise provided in this Section." (Arlington Heights, Ill., Zoning Ordinance §7.1 (1959).) If a use is nonconforming, it may not be extended, enlarged, or changed to another nonconforming use. Arlington Heights, Ill., Zoning Ordinance §§7.4—1, 7.2 (1959).

Under the Ordinance, special use permits are needed for "[c]emet[e]ries, crematories *or* mausoleums." (Emphasis added.) (Arlington Heights, Ill., Zoning Ordinance §4—1, Permitted Use Table (1959).) Illinois courts have held countless times that use of the disjunctive indicates that the writer intends to draw a distinction among the words used. (*People v. Frieberg* (1992), 147 Ill. 2d 326, 349, 589 N.E.2d 508,

518 ("As used in its ordinary sense, the word 'or' marks an alternative indicating the various members of the sentence which it connects are to be taken separately" unless a literal reading is inconsistent with an apparent legislative intent).) Thus, the use of the disjunctive here indicates that the Village intended that the two words be considered separate uses for the purposes of the Ordinance. Moreover, at the time the Ordinance was passed in 1959, the Cemetery contained at least one mausoleum, so use of the two words with the disjunctive indicates that the Ordinance views below- and above-ground disposition differently. We also find significant that the third of these three words, crematories, refers to a use quite different from a place for final disposition of human remains. In addition, we are mindful that among the purposes of the Ordinance is regulation of the intensity of land use and prevention of overcrowding. (Arlington Heights, Ill., Zoning Ordinance §§2.5, 2.12 (1959).) In this light, a definition of "cemetery" would not include mausoleums because the latter are structures built above ground and afford far more intense use of the same land. Here, for example, the proposed mausoleum would contain the remains of approximately 1,000 people but would occupy only approximately 6,500 square feet, whereas 1,000 graves surely would require far more area.

■ Accordingly, we hold that for the purposes of the Ordinance, a mausoleum is a use separate and distinct from that of a cemetery, so the Cemetery is not entitled to a building permit for the proposed mausoleum without first obtaining a special use permit. Given this disposition, we need not address the Cemetery's contentions that mausoleums are accessory or integral to cemeteries, or that the circuit court erred in relying on the administrative record and in finding that a mausoleum constitutes an extension or enlargement of the Cemetery use for the purpose of the Ordinance. As for the Cemetery's argument that to construe the Ordinance as making cemeteries and mausoleums distinct and mutually exclusive is contrary to the logic of a 1988 special use permit granted for a "cemetery garden" at a church, with the caveat that no mausoleum be built, we do not consider it, for this fact was not brought to the attention of the circuit court.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCORMICK, P.J., and EGAN, J., concur.