WIRTZ REALTY CORPORATION, Plaintiff and Counterdefendant-Appellee, v. J. DENNIS FREUND et al., Defendants and Counterplaintiffs-Appellants.

First District (3rd Division)    No. 1—97—3573

Opinion filed June 23, 1999.—Rehearing denied December 27, 1999.

Erik A. Martin & Associates, of Chicago (Mark S. Wheeler, of counsel), and Raymond F. Benkoczy, of Glenview, for appellants.

Gozdecki & Del Giudice, of Chicago (Eugene E. Gozdecki, David S. Americus, and Earl E. Farkas, of counsel), for appellee.

JUSTICE BURKE delivered the opinion of the court:

Defendants J. Dennis Freund (Dennis) and C. Geraldine Freund (Geraldine) appeal from an order of the circuit court granting plaintiff Wirtz Realty Corporation's (Wirtz) motion for summary judgment on plaintiff's claim for past-due rents, and the judgment of the circuit court, after a bench trial, in favor of plaintiff on defendants' counterclaim which alleged that Wirtz violated the Illinois Human Rights Act (775 ILCS 5/3—101 *et seq.* (West 1996)), which prohibits discrimination against mentally handicapped individuals in the rental of residential property. On appeal, defendants contend that the trial court erred in its interpretation of section 3—102.1(K) of the Human Rights Act (735 ILCS 5/3—102.1(K) (West 1996)); the trial court's judgment in favor of plaintiff on defendants' counterclaim was against the manifest weight of the evidence; and the trial court erred in granting plaintiff's motion for summary judgment on plaintiff's claim for unpaid rent. For the reasons set forth below, we affirm.

Plaintiff filed a complaint against defendants in the circuit court to collect past-due rent after it evicted defendants from their apartment at 1420 North Lake Shore Drive (1420 Building) in Chicago, Illinois. Defendants filed a counterclaim alleging plaintiff had violated the Human Rights Act by "imposing a 30-day 'mutual cancellation rider' on their lease, later barring [their adult son] Kenneth [Freund] from the building, and ultimately evicting them—all because of Kenneth's mental handicap." Plaintiff denied it had violated the Human Rights Act and, alternatively, raised an affirmative defense, based on section 3—102.1(K) of the Act, that it was justified in evicting defendants because Kenneth posed a "direct threat to the health and safety" of the building. In March 1994, the trial court granted plaintiff's motion for summary judgment on its claim for unpaid rent and entered judgment in plaintiff's favor. Defendants' counterclaim proceeded to a bench trial in 1997.

At trial, defendants called Harry Benjamin, plaintiff's vice president of property management, as an adverse witness. Benjamin testified that he was the individual responsible for terminating defendants' lease, as well as initially approving the filing of plaintiff's complaint against defendants. He began his responsibilities managing the 1420 Building around 1988 when John Pemberton, another of plaintiff's vice presidents, started to go into semi-retirement. Throughout 1988, Pemberton was responsible for the day-to-day operations of the 1420 Building and Benjamin would assist Pemberton. In mid-to-late 1989, Pemberton retired and Benjamin undertook the day-to-day operations of the 1420 Building. Benjamin testified that during the period of June 1973 through October 1988, plaintiff offered defendants stan-

dard one-year leases for their apartment at the 1420 Building. Except for formal letters he wrote to defendants concerning the renewal of their tenancy, Benjamin never documented any complaints or other conversations related to defendants. Benjamin never personally witnessed Kenneth "interacting in an inappropriate way with any building employee." According to Benjamin, all of his information about Kenneth came from reports by other employees. Except for when Kenneth "hurled a cigarette and a pop can at one of the employees," Benjamin stated that he had no reports of Kenneth touching any building employee or tenant. Benjamin admitted that at a prior deposition he did not testify that anyone had informed him that Kenneth had thrown a cigarette or Coke can at anyone. He also stated that upon reading the deposition of Trudence Kaplan (Trudence), a tenant in the 1420 Building, his recollection was refreshed about the events surrounding defendants' eviction.

Benjamin further testified that he could not recall anything that Pemberton told him about problems with defendants or Kenneth prior to 1988. In addition, Benjamin had no recollection of when he learned about an incident in 1987 when Kenneth was in front of the apartment of Justice William Clark, a tenant in the 1420 Building, threatening to kill the Justice, and testified it could have been after defendants were evicted. Benjamin also stated that around the beginning of November 1989, Fred Jach, the 1420 Building's engineer, stopped working at the building because of health problems and Toni Stipanicev became the building engineer. Benjamin further stated that sometime in 1988 or 1989 he became aware, through a conversation with Dennis, that Kenneth had sometimes resided in a hospital.

Benjamin also stated that he did not recall specific dates for many incidents. For example, he could not remember exactly which tenants he spoke to concerning complaints about Kenneth and could not specifically remember the year that Trudence complained about Kenneth urinating in an elevator. He stated several times that his recollection of 1988 and 1989 blended together and that he was not clear about any dates, but after reading Trudence's deposition prior to testifying, he believed the dates that Trudence had testified to in her deposition taken prior to trial were correct.

The evidence at trial revolved around eight incidents and the effect those incidents had on the operation of the apartment building and the persons involved. Specifically, the evidence focused on: (1) a 1986 incident in the apartment building's elevator between Kenneth and Linda Kaplan (Linda), another tenant; (2) a 1987 or 1988 incident when Linda observed Kenneth pacing in front of Justice Clark's front door; (3) incidents when Kenneth stood in front of building employees

and would not allow them to pass or continue their work; (4) a June 23, 1989, incident when Pemberton received a call from a man identifying himself as "Freund" and threatening to "get" Pemberton, Justice Clark, and Jach, because they were "bothering his mother"; (5) a July or August 1989 incident in the building elevator between Kenneth, Trudence, and a friend of Trudence; (6) a November 1989 incident when Trudence discovered dog food and garbage outside her apartment door and later saw Kenneth holding two knives; (7) an incident when Trudence observed Kenneth throw a lit cigarette and Coke can at the apartment building's doorman; and (8) Kenneth's reported return to the apartment building after defendants had assured plaintiff that he would not return.

### (1) 1986 Elevator Incident

Linda testified that in 1986 Kenneth and she were in the building's elevator when Kenneth turned to her with a lit cigarette in his mouth and asked whether she had the "money" she owed him. Linda further testified that Kenneth was very close to her and that she was "stunned, *** panicked, *** alarmed, uptight, and nervous" because she had never had contact with Kenneth before and there would be no reason for her to owe Kenneth anything. She reported the incident to Jach, who gave her his home telephone number and asked that she call him if she had further problems. Also with respect to this incident, neither Pemberton, in his deposition testimony admitted during trial, nor Benjamin testified that he knew of the incident.

### (2) Threats Against Justice Clark and His Parents

Linda testified that one day she entered the apartment building and observed Kenneth pacing in front of Justice Clark's apartment door and shouting about killing Justice Clark and his parents. Linda stated that she was "terrified," did not use the elevator, and followed the doorman's suggestion to leave the building until the situation was resolved. The evidence also showed that Pemberton did not testify he knew about the incident, Benjamin never specifically mentioned the incident, and Benjamin was unclear as to when he first learned of it.

### (3) Incidents With Building Employees

Harry Benjanmin testified that Jach, the building engineer, told him that other employees were reporting to Jach that Kenneth was obstructing their work by standing in front of them and not allowing them to pass, threatening to have them fired, and accusing them of stealing. The record does not contain any direct evidence from the actual employees about the harassment, and no evidence that Kenneth ever physically harmed anyone. The record does contain a letter

to defendants in 1989, in which Pemberton stated that Wirtz was concerned about Kenneth's continued harassment of employees and that a solution would have to be found.

### (4) June 23, 1989, Telephone Call to Pemberton

In his deposition, admitted at trial, Pemberton testified that on June 20, three days before he received the threatening telephone call from Kenneth, he had sent a letter to defendants expressing Wirtz's concerns about Kenneth's actions and about defendants' continued tenancy. No evidence was presented that Benjamin knew about the threats and, in fact, Pemberton stated in his deposition that he told no one other than Jach about the call.

### (5) Urination in the Elevator

Trudence testified that Kenneth exposed his penis to her and another woman in a closed elevator and proceeded to urinate. She stated that the incident frightened her and that she immediately reported the incident to the doorman and Benjamin. She further stated that she became concerned for the safety of her teenage daughter and instructed her daughter not to ride the elevator if Kenneth was on it.

### (6) Dog Food and Knives Incident

Trudence testified that she discovered dog food near her apartment and Kenneth had placed it there to poison her dog. She proceeded to defendants' apartment and confronted Dennis, in an "elevated voice," about the trash. Kenneth then appeared behind his father brandishing two long knives over his head. After several minutes, Kenneth left and then reappeared with a cigarette in his mouth. Trudence stated that she could have made an exit from the situation but did not, and she did not "feel that *** [Kenneth] was going to come and stab *** [Trudence and the building employee who accompanied her to defendants' apartment]." Trudence reported the incident to Benjamin and told Benjamin that she feared for the safety of her daughter. After this incident, plaintiff offered defendants a new lease, but added a 30-day mutual cancellation rider to the lease which allowed either party to cancel the lease after giving 30 days' notice.

### (7) Throwing of Cigarette and Coke Can

As to this incident, there was no evidence that the objects Kenneth threw came close to striking the doorman. The doorman never testified, and Trudence testified that the doorman "didn't seem to be very upset about it." Trudence characterized Kenneth's conduct as unpredictable, reported the incident to Benjamin, and told Benjamin that, as a result of Kenneth's continued misconduct and the building management's inability to remedy the situation, her family was going

to move out of the building. Stipanicev, the building engineer, testified that although the doormen were to report to him concerning problems, none had reported problems with Kenneth.

After this incident, Wirtz sent defendants the first lease cancellation notice, requiring defendants to vacate their apartment by January 31, 1990. On January 3, Wirtz and Dennis came to an agreement whereby defendants agreed that Kenneth would not return to the building in exchange for Wirtz's rescission of the lease cancellation. This agreement was in effect until March 3, 1990, when Wirtz sent defendants a second lease cancellation notice.

### (8) Kenneth's Return to the Building

Benjamin testified that around March 2, 1990, he received a report from Stipanicev that Kenneth had returned to the building. As a result of this report, Benjamin directed his secretary to prepare a letter to defendants terminating their lease, dated March 3, 1990. The record shows that at the time Wirtz claimed Kenneth returned, he was involuntarily committed in the University of Chicago Hospital and had been so committed since December 1989. The only time he could have returned was late in the afternoon on March 2, when he had a one-day pass from the hospital.

The evidence also revealed that Stipanicev kept a log of events in the building. An entry in the log dated August 6, 1990, shortly before defendants vacated their apartment, read, "Benjamin talk about Freund's son (dog)." Stipanicev testified that this notation was a reminder to himself to talk to Benjamin about the problem of defendants' dog barking all night.

After both parties rested and the trial court heard their arguments, the court found it was reasonable for Wirtz to conclude that the risk to the safety of other tenants was such that Kenneth was considered a direct threat and warranted the termination of defendants' lease. The trial court did not specifically rule that Kenneth was a direct threat to others or that defendants had established a *prima facie* case of discrimination, pursuant to the Human Rights Act's prohibition of discrimination based on a mental handicap, or otherwise demonstrated that, absent an affirmative defense, they would have been entitled to judgment. This appeal followed.

■ Defendants initially argue that they proved their discrimination claim and Wirtz argues that defendants failed to do. See generally *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) (establishing a burden-shifting analysis to prove indirect discrimination); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) (establishing elements to

prove direct discrimination and defense to such a claim). However, these arguments are not helpful to a determination of the dispositive issue in this appeal of whether plaintiff established its affirmative defense that Kenneth posed a direct threat to the health and safety of the building. In denying defendants' motion for a directed finding at the conclusion of their case in chief, the trial court necessarily found that defendants had at least established a *prima facie* case of discrimination. Even though the trial court, in its judgment order, never specifically stated that defendants successfully established a *prima facie* case, it is implicit in that order because without such a finding, we do not see any reason for the trial court to then go on to decide whether plaintiff successfully proved its affirmative defense. Moreover, given our determination, as discussed below, that plaintiff did successfully prove its affirmative defense, an explicit finding that defendants did, in fact, establish that, absent a rebuttal or affirmative defense, they were entitled to judgment is unnecessary.

Defendants first argue the trial court erred by "applying the wrong legal standard to *** [plaintiff's] key defense [that Kenneth was a 'direct threat' to the health and safety of the building]." Additionally, defendants argue that the trial court erred "by considering the *** [Human Rights Act] satisfied by proof of the reasonableness of *** [plaintiff's] subjective 'belief' that Kenneth posed a threat, rather than objective proof that Kenneth, in fact, posed such a threat." Defendants further argue, in their brief to this court, that the trial court, in effect, changed the wording of the statute to read "[n]othing *** requires that a dwelling be made available to an individual whose tenancy *the landlord reasonably believes* would constitute a direct threat." (Emphasis in original.) Plaintiff argues the trial court properly applied the statute and that the evidence established that Kenneth was a "direct threat."

■ A question of statutory interpretation is a question of law and reviewed *de novo. Memory Gardens Cemetery, Inc. v. Village of Arlington Heights*, 250 Ill. App. 3d 553, 621 N.E.2d 107 (1993). Section 3—102.1(K), which states that "[n]othing in this Section requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of others or would result in substantial physical damage to the property of others" (775 ILCS 5/3—102.1(K) (West 1996)), provides an affirmative defense to landlords in actions against them for violations of the Human Rights Act. Section 3—102.1(K) closely parallels section 3604(f)(9) of the Fair Housing Amendments Act of 1988, which provides that "[n]othing [in the Act] *** requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or

safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9) (1994). What conduct constitutes a "direct threat" is a question of first impression in Illinois and, therefore, we examine the relevant federal law on the issue. See *Trayling v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 1, 11, 652 N.E.2d 386 (1995); *Faulkner-King v. Department of Human Rights*, 225 Ill. App. 3d 784, 788, 587 N.E.2d 599 (1992); *Turner v. Human Rights Comm'n*, 177 Ill. App. 3d 476, 532 N.E.2d 392 (1988).

When a statute is unambiguous, it is not necessary to consult the legislative history or other materials to attempt to glean the legislature's intent. See generally *Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 632 N.E.2d 1035 (1994); *Harvey Firemen's Ass'n v. City of Harvey*, 75 Ill. 2d 358, 389 N.E.2d 151 (1979). However, at least one federal court has found that section 3604(f)(9) is ambiguous (see *United States v. Massachusetts Industrial Finance Agency*, 910 F. Supp. 21, 27 (D. Mass. 1996)), and another has found that an interpretation of section 3604(f)(9) is left to the courts. *Baggett v. Baird*, No. 4:94CV0282—HLM (N.D. Ga. February 18, 1997). Accordingly, given the conflicting interpretation of the relevant federal law, we find that an examination of the legislative history, in the present case, is appropriate.

The *Massachusetts Industrial* court, quoting the legislative history and congressional intent of the Fair Housing Amendments Act of 1988, stated, "Invocation of the 'direct threat' exemption requires 'objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health and safety of others.' " *Massachusetts Industrial*, 910 F. Supp. at 27, quoting H. Rep. No. 100—711, at 30 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2191. The legislative history relating to what constitutes a direct threat specifically states:

> "Any claim that an individual's tenancy poses a direct threat and a substantial risk of harm must be established on the basis of a history of overt acts or current conduct. Generalized assumption, subjective fears, and speculation are insufficient to prove the requisite direct threat to others. In the case of a person with a mental illness, for example, there must be objective evidence from the person's prior behavior that the person has committed overt acts which caused harm or which directly threatened harm." H. Rep. No. 100—711, at 29 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2190.

Thus, it is clear that there must be *objective* evidence of overt acts that caused harm or acts which directly threaten harm in order to establish that someone is a "direct threat."

■ In the present case, the trial court never specifically found that any of Kenneth's acts were a "direct threat" to the safety of the building. Instead, the trial court stated:

"I do think that the level of risk had risen to a degree where the only thing that hadn't been done was nobody was hurt. But I don't know whether or not it would have happened. Nobody gives me a crystal ball. Nobody gives Wirtz a crystal ball either. I know from the testimony that Wirtz was threatened with a lawsuit by other tenants in the building, and I think that they still held in there even though the threat was there. So I think I cannot fault them with getting weak-kneed about other lawsuits. But certainly when the time came and they felt that the risk was high the question was, was that reasonable considering the reports that they got, was their anticipation of risk to other tenants in the building high? And I came to the conclusion the answer to that is yes."

The trial court's decision never explicitly mentions any direct threat, only the subjective fears of the persons to whom the acts were directed or those who witnessed Kenneth's behavior. The trial court never found that those actions caused harm or threatened harm. The trial court instead found that the actions were becoming more frequent and that the actions demonstrated the "level to which *** Ken's lack of self-control had reached." In addition, the trial court concluded, not whether Kenneth actually physically harmed any of the tenants who complained, but instead, "[D]id it appear that he had the ability to do it and could one conclude that he wasn't going to do it? Do we have a one bite rule in this case like we do in a dog bite case? *** I didn't come to that conclusion." The trial court's rationale and conclusions demonstrate that instead of *objectively* looking at the evidence presented and drawing conclusions from those facts, it analyzed the *subjective* fears and apprehensions of plaintiff and the concerned tenants and, in effect, determined that Kenneth's conduct was a direct threat. Such an analysis runs contrary to the clear legislative intent that there be proof by *objective* facts of a direct threat. Accordingly, we find that, to the extent that the trial court relied upon subjective factors in reaching its conclusion, it incorrectly interpreted section 3—102.1(K).

■ It is therefore necessary for us to determine what form such an objective test should take to determine whether, regardless of its error in interpreting section 3—102.1(K), the trial court correctly determined that Kenneth posed a "direct threat." Plaintiff argues that the trial court's use of its "reasonable" belief is the classic "objective" test borrowed from tort law. Defendants, on the other hand, contend that "like other anti-discrimination laws, the [Human Rights] Act requires that, to be 'reasonable,' *** [plaintiff's] conclusion that a

person posed a 'direct threat to the health and safety of others' must logically follow from its knowledge of the legally-sufficient objective facts."

In *Bragdon v. Abbott*, 524 U.S. 624, 141 L. Ed. 2d 540, 118 S. Ct. 2196 (1998), the Supreme Court answered the question of whether a dentist could refuse to fill a cavity for a patient who was HIV positive but whose AIDS symptoms had not yet manifested themselves. After first determining that being HIV positive is a disability under the Americans With Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et seq.* (1994)), the Court addressed the question of how a doctor is to determine if an action would result in a direct threat to the health or safety of others. The dentist in *Bragdon* refused to fill the patient's cavity in his office, citing his policy of not filling cavities for HIV-positive patients except in a hospital. The district court granted the patient's motion for summary judgment, finding that there was no evidence that performing the procedure would constitute a direct threat. The court of appeals affirmed. The Supreme Court, finding that the two lower courts had not examined the evidence or developed the record sufficiently, vacated the grant of summary judgment. *Bragdon*, 524 U.S. at 654-55, 141 L. Ed. 2d at 567-68, 118 S. Ct. at 2213. With respect to the proof necessary to establish a direct threat under the ADA, the Court stated:

"The ADA's direct threat provision stems from the recognition in *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273[, 287, 107 S. Ct. 1123, 1130-31, 94 L. Ed. 2d 307, 320] (1987), of the importance of prohibiting discrimination against individuals with disabilities while protecting others from *significant health and safety risks*, resulting, for instance, from a contagious disease. In *Arline*, the Court reconciled these objectives by construing the Rehabilitation Act not to require the hiring of a person who posed 'a significant risk of communicating an infectious disease to others.' [Citation.] Congress amended the Rehabilitation Act and the *Fair Housing Act to incorporate the language.* [Citations.] It later relied on the same language in enacting the ADA. [Citation.] ***

The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence. [Citations.] As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability. ***

Our conclusion that courts should assess the objective reasonable-

ness of the views of health care professionals without deferring to their individual judgments does not answer the implicit assumption in the question presented, whether petitioner's actions were reasonable in light of the available medical evidence." (Emphasis added.) *Bragdon*, 524 U.S. at 649-50, 141 L. Ed. 2d at 564-65, 118 S. Ct. at 2210-11.

As the Court in *Bragdon* stated, this test was derived from the language of the ADA, which was borrowed from the language of the Fair Housing Amendments Act. *Bragdon*, 524 U.S. at 654, 141 L. Ed. 2d at 567, 118 S. Ct. at 2210. As such, since section 3—102.1(K) of the Illinois Human Rights Act is nearly identical to section 3604(f)(9) of the Fair Housing Amendments Act, we find that the proper test to use in the present case is whether plaintiff's actions in evicting defendants was reasonable in light of the available objective evidence concerning Kenneth's behavior. See generally *Bragdon*, 524 U.S. at 650, 141 L. Ed. 2d at 565, 118 S. Ct. at 2211.

■ Defendants argue that the trial court's judgment, even using an objective test, was against the manifest weight of the evidence. Further, defendants argue that none of the incidents actually caused or threatened harm and that verbal threats cannot constitute an overt act to satisfy the requirement that a person be a "direct threat." Additionally, defendants argue that many of the incidents are neither legally nor factually relevant and improperly rely on the subjective beliefs of Linda and Trudence, other tenants and plaintiff's employees' beliefs. Plaintiff argues the evidence supports the trial court's judgment.

When the trial court, as in the present case, bases its judgment on the testimony and credibility of the witnesses at trial, we will not disturb that judgment unless the trial court's decision was against the manifest weight of the evidence. See *Raclaw v. Fay, Conmy & Co.*, 282 Ill. App. 3d 764, 668 N.E.2d 114 (1996).

Section 3—102.1(K) of the Human Rights Act requires proof of a direct threat of harm. As stated above, that term encompasses " 'objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health and safety of others.' " *Massachusetts Industrial*, 910 F. Supp. at 27, quoting H. Rep. No. 100—711, at 30 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2191. As in employment discrimination claims, where the tests are, like in all discrimination claims including housing discrimination, similar, there is not a requirement that a person physically harm another before action can be taken. See generally *Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997) (holding that "[t]he [Americans with Disabilities] Act does not require an

employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone"). While the issue in *Palmer* was the plaintiff's failure to establish a *prima facie* case of employment discrimination by demonstrating she was "otherwise qualified" for the position she held, defendants here have presented no authority why the court's holding with regard to retaining a *potentially violent employee* would not be applicable in the current case dealing with a *potentially violent tenant*. While there is no federal case law directly on point addressing a "potential" threat with respect to claims under the Fair Housing Amendments Act, we believe that *Palmer*, because it is a discrimination case, is instructive in helping to define what conduct constitutes a direct threat in discrimination claims under the ADA. See *Turner v. Illinois Human Rights Comm'n*, 177 Ill. App. 3d 476, 532 N.E.2d 392 (1988).

The trial court in the present case relied on many problems with Kenneth's behavior as factors in considering the reasonableness of plaintiff's action in evicting defendants. However, as discussed above, the incidents must be both recent and relevant. Plaintiff did not seriously argue in this court that the incident involving Kenneth asking Linda if she had the money she owed him, which was approximately three years prior to the institution of eviction proceedings, could be considered recent. Plaintiff continued to offer defendants standard leases after this incident. Further, without Benjamin, in particular, being aware of the incident, there is no way that the incident could have played a role in plaintiff's decision to evict defendants because Benjamin was not aware of the incident. Accordingly, we find that any reliance by the trial court on the incident involving Linda owing money to Kenneth was error.

As to the 1987 or 1988 incident in front of Justice Clark's apartment door, as defendants point out in their brief to this court, there are at least two problems with the trial court's use of this incident. First, the incident occurred in 1987 or 1988, at least one year before the first eviction notice to defendants. Secondly, the evidence showed that, at the very least, this incident was not a motivating factor in plaintiff's decision to evict defendants; Benjamin never testified that he was aware of the incident and, in fact, plaintiff gave defendants a new lease after this incident. As such, we find that the incident was not recent, there was no evidence that it played any role in plaintiff's decision to evict defendants, and because the trial court relied, at least in part, on the subjective fears of tenants, the incident was not relevant to a determination of plaintiff's affirmative defense, and any reliance by the trial court on this incident was error.

With respect to the June 23, 1989, phone call to Pemberton in which Kenneth threatened Pemberton, Jach, Justice Clark, and his parents, which the trial court relied on as evidence that Kenneth posed a direct threat, there was no evidence presented at trial that Benjamin, the final decision maker for plaintiff, knew of the phone call to Pemberton, and, in fact, Pemberton testified that he told no one other than Jach about it. Accordingly, there was no evidence that Benjamin took the incident into consideration when deciding to evict defendants. Without evidence that Benjamin knew about the incident, there is no relevant basis on which the trial court could consider the incident as evidence of Kenneth posing a "direct threat." See generally *Schneiderman v. Kahalnik*, 200 Ill. App. 3d 629, 558 N.E.2d 334 (1990) (holding that evidence is relevant when it tends to prove a fact in controversy). Accordingly, we find that the trial court's reliance on this incident was error.

Defendants next argue the trial court improperly used Kenneth's "interference" with, and "accusations" against, building employees to justify its judgment because there was no direct proof that the incidents happened and the incidents were introduced solely as proof of plaintiff's notice. Plaintiff argues the trial court correctly relied upon the incidents. As to these incidents, the trial court stated:

> "There were indications that—by Fred Jach to Mr. Benjamin that his people were being interfered with, the accusations of theft, the threat of Ken, I should say Ken's accusations of theft from him.
>
> * * *
>
> They had no merit to them yet he was accusing people of stealing in a quality building in a conduct that could not be condoned and jeopardized their jobs. He also threatened to have them fired. He interfered with their work. He would step in front of them."

These incidents were ongoing problems, and while they were introduced only as proof of plaintiff's knowledge and not substantive evidence that the incidents actually took place, defendants cite no authority in support of their argument that the incidents are not relevant and admissible to demonstrate and explain why plaintiff took the actions it did in evicting defendants. Plaintiff correctly notes that the reasons and basis of its decision to evict defendants were relevant to rebut the charge of unlawful discrimination. See generally *McDonnell Douglas*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. The weight to be given these incidents was one left to the discretion of the trial court. *Raclaw*, 282 Ill. App. 3d at 767. We note that defendants did not object to the introduction of this evidence at trial and that, as notice of what information plaintiff had when making its decision to evict defendants, the incidents were relevant and admissible. See generally

*Schneiderman*, 200 Ill. App. 3d 629. We therefore conclude that the trial court did not err in its limited use of these incidents in its decision.

The next incident defendants argue the trial court improperly considered was Kenneth urinating in the elevator in front of Trudence, which defendants characterize merely as "inappropriate" behavior demonstrating "poor 'social skills.' " Plaintiff argues that the incident was evidence of more than inappropriate behavior and demonstrated a disruption of the smooth operation of the building.

The incident happened in the summer of 1989, approximately three to four months before the first termination of defendants' lease, and was the first of the three incidents that the trial court primarily relied upon in finding, in effect, that Kenneth posed a "direct threat" to the safety of the building. The evidence at trial showed that Trudence and a friend were on the elevator with Kenneth when Kenneth unzipped his pants, exposed his penis, and turned and urinated in the elevator. There was evidence that Kenneth's actions were upsetting to the other passengers of the elevator, that Kenneth was a big man in a small elevator with two women, that no one said anything, that Kenneth never attempted to harm, touch, or communicate with either woman, that he allowed them to leave the elevator when it reached the first floor, and never threatened them. Trudence testified that she immediately notified Benjamin, who notified defendants that such behavior was inappropriate. Trudence further testified that she was concerned for the safety of her daughter. Plaintiff did not terminate the lease, or provide notice, as the lease in force at the time allowed, that another such incident would result in eviction. The evidence further demonstrated that plaintiff was concerned about Kenneth's behavior as a result of this incident. While this incident, standing alone, may not rise to the level of a "direct threat," it is evidence of the disruption of the operation of the building and defendants do not dispute that the behavior was inappropriate. It was objectively a situation that plaintiff wanted remedied to ensure the smooth operation of the building and to ensure that its tenants felt safe in their homes. See generally *Bragdon*, 524 U.S. at 650, 141 L. Ed. 2d at 565, 118 S. Ct. at 2211 (holding that an objective test consists of "whether petitioner's actions were reasonable in light of the available [objective] evidence").

The next incident defendants claim the trial court improperly relied upon in finding, in effect, Kenneth was a "direct threat" was the dog food/knives·incident. In describing this incident, the trial court stated:

> "There is also the notation I made in the court with regards to the testimony of Trudence Kaplan that in November of '89, her

findings of the dog food on the plastic lid, the garbage with cigarette butts in it found against the door on her level and her reaching the conclusion it was Ken Freund certainly exacerbated her prior experiences with him.

\* \* \*

Then we come to the November '89 incident, as I said, when she went upstairs. And it was at that time when she saw Ken standing behind his father, whether his father was aware of it or not, nobody really told me. His denial of the incident may very well be that he never saw it. But she claimed that he [Kenneth] was brandishing 10 inch knives, giving slashing motions with those knives, and they were—I'm trying to think of the type of knives. But certainly the description of the size of the blade told the story. And, again, she, Trudence Kaplan, was concerned about the welfare of her daughter. The action and the pantomime by Ken appear[ ] to describe violent behavior."

There was no evidence in the record to support a finding that Kenneth placed the dog food and trash near Trudence's door. The trial court recognized this because it made it clear that it did not rely on the dog food incident so much as Trudence's actions after discovering the food and her confrontation with Dennis.

With respect to the subsequent confrontation with Dennis while Kenneth brandished knives behind his father, the record does not support the trial court's conclusion that Kenneth made "slashing" motions. However, the record does support the conclusions that Kenneth held the 10-inch knives over his head and that his facial expression was "frightening." The record also established that Kenneth did not attempt to get around Dennis, and Trudence testified that "very soon after Kenny came up behind Dr. Freund[,] \*\*\* it became clear to me that he was not coming out of the apartment to stab anybody." Trudence further testified that she reported the incident to Benjamin and told Benjamin that Kenneth's behavior was threatening and unpredictable and that she was afraid for her daughter's safety because there was "a six-foot tall man who was carrying, brandishing knives and who was urinating in an elevator."

This incident happened approximately one month before plaintiff's first termination letter. We find that it demonstrates an escalation in intensity from Kenneth's prior behavior. Using defendants' characterization of the urination incident as "inappropriate behavior," after this incident, plaintiff had objective evidence before it that Kenneth's recent behavior had progressed from inappropriate behavior to intimidation through his physical actions, *i.e.*, holding the knives up in front of Trudence when Trudence was complaining about Kenneth's actions. This incident was recent and demonstrated Kenneth's

continued "unacceptable and inapproprate behavior," as characterized by Benjamin. Accordingly, we find that the trial court did not err in considering this incident in determining, in effect, that Kenneth posed a "direct threat" to the health and safety of the building.

Defendants next argue the trial court erred in using the throwing of a cigarette and a Coke can as evidence that Kenneth posed a "direct threat" to the safety of the building. Defendants contend that "[t]here was no finding or evidence that anyone was hurt or that the cigarette or Coke can hit or came close to hitting anyone. Plaintiff argues that the fact that the objects may not have hit anyone is not relevant to the fact that they could have injured someone and present a direct threat to the safety of others.

This incident is the only one in which Kenneth took physical action that was directed toward someone else. The evidence showed that it occurred in December 1989, the same month that Kenneth was again involuntarily committed to a hospital and the same month that plaintiff first terminated the lease. The evidence further showed that when Trudence's daughter returned from school, she was crying and upset because she saw Kenneth throwing objects at the doorman. Trudence then went downstairs to the lobby and observed Kenneth throwing objects at the doorman. Trudence immediately reported the incident to plaintiff and stated that the incidents had risen to the level where she was going to move out of the building.

Defendants place much emphasis on the fact that the doorman never testified and that Trudence testified that the doorman did not seem upset by the situation. However, just as defendants contend that the subjective fears of other witnesses is not relevant to prove a direct threat, the lack of any fear should not be used then to demonstrate the lack of a direct threat. What this incident demonstrates, as the trial court found, was "the level to which Ken's lack of self control had reached." Kenneth took physical steps against another person in the building, physically manifested aggressive behavior, and the incident occurred immediately before the first termination notice. Based on the foregoing, we find that the trial court did not err in using this incident in determining that Kenneth posed a "direct threat."

It was after this last incident that plaintiff notified defendants that it was exercising the 30-day cancellation rider and terminating defendants' lease. Thereafter, Dennis met with plaintiff and attempted to work out a solution with plaintiff whereby defendants would be permitted to stay in the building. As a result of that meeting, it was agreed that Kenneth would not return to the building. Plaintiff agreed to allow defendants to stay in the building and defendants agreed that Kenneth would not return. Plaintiff specifically notified defendants that the 30-day cancellation rider remained in effect.

The final incident defendants claim the trial court improperly relied on in finding, in effect, that Kenneth was a direct threat was Kenneth's return to the building on March 2, 1990. It was undisputed that Kenneth was admitted to the University of Chicago Hospital on December 15, 1989, and was not discharged until March 30, 1990. The only time Kenneth left the hospital was on supervised day passes with his father, one of which was on March 2, 1990. Dennis testified that he picked Kenneth up at 2:30 p.m. on March 2 and took him for a walk around the hospital grounds, to eat at Ann Sather, and then returned him to the hospital at approximately 5:30 p.m. Kenneth's pass permitted him to be out of the hospital until 6 p.m. The only evidence that Kenneth returned to the hospital, besides Dennis' testimony, was a notation on Kenneth's chart that stated that Kenneth was back in the hospital at 11:15 p.m. Evidence of Kenneth's return to the 1420 Building was based upon Benjamin's testimony that he received a report from Stipanicev that a tenant had seen Kenneth around the building. It was this report that prompted Benjamin to write the second termination notice dated March 3. Stipanicev testified that a tenant told him that Kenneth was back in the building and that he then reported that to Benjamin the next day.

The trial court, in making findings about Kenneth's return, stated: "On March 2, it is odd that Ken has a one-day pass. If you believe in coincidences, all things considered, Wirtz people do not know where Ken is. They don't know that he's been involuntarily admitted to the University of Chicago Hospital. They are not aware of the fact that he has a day pass. While the letter is dated March 3, the fact of the matter is it does follow chronologically the March 2 day pass for Ken, and the letter of termination is again sent. One has to ask themselves, how would one know that Ken was out on a pass in order to make the 3/3/89—3/3/90 letter viable? It is only the Freunds that know. So it may very well be that Ken was in and around the building. I recognize the time frame. The time was pointed out by Mr. Springer [defendants' counsel]. I haven't lost cognizance. But in order to buy the time frame I have to buy the testimony."

Defendants strenuously argue that the evidence failed to support a finding that Kenneth's return to the building was the reason for Benjamin's March 3, 1990, termination letter. Defendants argue that since Benjamin's secretary did not work on Saturdays, and Kenneth's alleged return to the building would have had to occur late on a Friday afternoon, since his pass was an afternoon pass, and Kenneth's alleged return was not reported to Benjamin until the following day, there is no way that the evidence could support a finding that Kenneth in fact had returned.

In making its findings, the trial court did not give any weight to the testimony of Dennis, specifically stating, "[I]n order to buy the time frame I have to buy the testimony." In rejecting defendant's argument that the reason for the March 3 termination letter could not have been Kenneth's return to the building, the trial court found it too coincidental that no one other than defendants knew Kenneth was involuntarily committed, that he had a day pass on March 2, and the sighting of Kenneth in the building just happened to be on the same day of his pass. Although the fact that the March 3 termination letter contains the notation "HVB/pm," which would indicate that Benjamin's secretary prepared the letter, was a factor to consider in determining the sequence of events, there was evidence to support the conclusion that Kenneth returned to the building on March 2, 1990. It was the only time he was released from the hospital. The trial court did not believe Dennis' testimony that he did not bring Kenneth home. Such a determination concerning the credibility of witnesses and the weight to be given to testimony is one, as discussed above, for the trial court. We therefore find that the trial court's finding was supported by evidence and, as such, was not against the manifest weight.

■ Once all the incidents the trial court relied upon are reviewed, it is necessary to determine if, based upon the objective test set forth above, plaintiff's action in terminating defendants' lease was reasonable in light of the available objective evidence of Kenneth's behavior. Resolution of this issue will be determinative of whether the trial court's ultimate decision, in effect, that Kenneth's continued presence in the building was a "direct threat" to the health and safety of the building, was against the manifest weight of the evidence.

As discussed above, the only incidents that were recent and relevant incidents to a determination of whether Kenneth's behavior constituted a "direct threat" were Kenneth's ongoing threats and accusations toward plaintiff's employees, his urination in the elevator, the dog food/knives incident, the throwing of the cigarette and Coke can, and Kenneth's subsequent return to the building in violation of the parties' agreement. Placing the incidents on a timeline, it becomes clear that over time Kenneth's behavior began to escalate in intensity. He repeatedly threatened building employees with the loss of their jobs, accused them of stealing from him, and physically stood in front of them so that they could not pass. During the summer of 1989, he exposed his penis and urinated in front of two women in a small enclosed elevator, a space which provided no escape for the women. A few months later, in November 1989, he brandished two large knives in front of Trudence when she complained about his behavior to Dennis. Trudence testified that Kenneth "looked very frightening, eyes

agape and a scowl." Trudence further testified that Dennis was made aware of Kenneth's presence with the knives, but was unconcerned. Finally, the evidence showed that a month after the incident with the knives, Kenneth was seen physically throwing objects at a building employee. It is then that plaintiff decided, based on the evidence of Kenneth's continued inappropriate behavior, even after asking defendants to control him on earlier occasions, that his behavior was continuing to become more disruptive, more dangerous, and more unpredictable and that the only solution still available was to remove defendants, and Kenneth, from the building.

Even after reaching the conclusion that Kenneth needed to be removed from the building, plaintiff gave defendants another chance to remain in the building by agreeing that defendants could remain if Kenneth did not return. Once plaintiff received a report that Kenneth had returned, it again exercised the cancellation rider provision. Looking at all the evidence available to plaintiff, we find that there was objective evidence to support the trial court's conclusion, in effect, that Kenneth posed a "direct threat," *i.e.*, the escalating nature of Kenneth's actions and his return to the building after defendants agreed he would not. We therefore find that the trial court's decision, in effect, that Kenneth posed a direct threat to the health and safety of the building was not against the manifest weight of the evidence.

In summary, we hold that the trial court's judgment in favor of plaintiff on defendants' counterclaim was not against the manifest weight of the evidence and that the trial court did not err in granting summary judgment on plaintiff's complaint for unpaid rent.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.